**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker (241590)
150 E. Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:   (561) 394-3399
Facsimile:   (561) 394-3382
E-mail: msaxena@saxenawhite.com
          jwhite@saxenawhite.com
          lhooker@saxenawhite.com

-and-

Steven B. Singer
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:   (914) 437-8551
Facsimile:   (888) 631-3611
E-mail: ssinger@saxenawhite.com

*Lead Counsel for Lead Plaintiff*
*and the Class*

**KAPLAN FOX &
KILSHEIMER LLP**
Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard
Suite 820
Los Angeles, CA 90025
Telephone: 310.575.8604
Facsimile: 310.444.1913
E-mail: jfarar@kaplanfox.com
-and-

Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415.772.4700
Facsimile: 415.772.4707
Email: lking@kaplanfox.com
          mchoi@kaplanfox.com

*Liaison Counsel for Lead Plaintiff*
*and the Class*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEON D. MILBECK, on behalf of himself and all others similarly situated<br><br>Plaintiff,<br><br>vs.<br><br>TRUECAR, INC.; MICHAEL GUTHRIE; VICTOR ("CHIP") PERRY; JOHN PIERANTONI; ABHISEK AGRAWAL; ROBERT BRUCE; CHRISTOPHER CLAUS; STEVEN DIETZ; JOHN KRAFCIK; ERIN LANTZ; WESLEY NICHOLS; ION YARDIGAROGLU; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES LLC; RBC CAPITAL MARKETS, LLC; JMP SECURITIES LLC; B. RILEY & CO., LLC; CRAIG-HALLUM CAPITAL GROUP LLC; STEPHENS, INC.; and LOOP CAPITAL MARKETS LLC;<br><br>Defendants. | No. 2:18-cv-02612-SVW<br><br><u>CLASS ACTION</u><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND** |

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE ACTION ........................................................................... 1

II.  INTRODUCTION .......................................................................................... 1

III.  JURISDICTION AND VENUE ..................................................................... 6

IV.  EXCHANGE ACT PARTIES ........................................................................ 7

    A.  Lead Plaintiff ...................................................................................... 7

    B.  Defendants ........................................................................................... 7

V.  OVERVIEW OF THE FRAUD ..................................................................... 9

    A.  Background Of TrueCar........................................................................ 9

    B.  TrueCar Was Highly Intertwined With, and Dependent On, Its Largest Affinity Partner and Largest Shareholder USAA ................. 11

    C.  In Early 2017, TrueCar's Key Risk Pertaining to USAA Materialized:  USAA Implemented Significant Changes to the Co-Branded Car Buying Website ................................................... 16

    D.  Throughout the Class Period, Defendants Concealed USAA's Website Changes While They Represented TrueCar's Affinity Partnership with USAA as a Key Driver of Unit Growth in 2017 ..... 23

    E.  In the Midst of Their Misrepresentations, Defendants Engage in Substantial Insider Sales—While Continuing to Tout TrueCar's Accelerating Unit Growth ................................................................ 24

    F.  After Dumping Their Stock, Defendants Continue to Mislead the Market About TrueCar's Affinity Relationship With USAA ....... 30

VI.  THE TRUTH COMES OUT ........................................................................ 32

VII.  POST CLASS-PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD.......................................................................................................... 35

VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS............................................................. 37

    A.  Fourth Quarter and Full Year 2016..................................................... 37

    B.  Statements Regarding the Company's April 2017 Offering .............. 41

    C.  First Quarter 2017 .............................................................................. 42

    D.  Second Quarter 2017........................................................................... 43

IX.  DEFENDANTS CAPITALIZED ON THEIR FRAUD THROUGH MASSIVE AND SUSPICIOUSLY TIMED INSIDER SALES, SUPPORTING A STRONG INFERENCE OF SCIENTER ....................... 47

# TABLE OF CONTENTS

**Page**

X.      ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..........53

XI.     LOSS CAUSATION .................................................................................59

XII.    PRESUMPTION OF RELIANCE ...........................................................61

XIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE....................................................62

XIV.    CLASS ACTION ALLEGATIONS.........................................................63

XV.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.........................64

        COUNT ONE ..........................................................................................64

        COUNT TWO ..........................................................................................67

XVI.    SECURITIES ACT CLAIMS .................................................................68

        A.      Background for the Securities Act Claims ...........................69

        B.      The Securities Act Parties....................................................70

XVII.   THE OFFERING DOCUMENTS CONTAINED MATERIAL MISREPRESENTATIONS..............................................................................76

XVIII.  CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ......................78

        COUNT III  ............................................................................................78

        COUNT IV  ............................................................................................81

        COUNT V ..............................................................................................83

XIX.    PRAYER FOR RELIEF............................................................................85

XX.     JURY DEMAND ......................................................................................86

## I.     NATURE OF THE ACTION

1.     Oklahoma Police Pension and Retirement Fund ("Oklahoma Police" or "Lead Plaintiff"), brings this securities class action on behalf of itself and all other persons and entities who purchased or otherwise acquired (1) any of the publicly-traded common stock of TrueCar, Inc. ("TrueCar" or the "Company") from February 16, 2017 through November 6, 2017 (the "Class Period"), or (2) the common stock of TrueCar pursuant and/or traceable to the secondary offering of TrueCar common stock conducted on or about April 26, 2017 (the "Offering"), and were damaged thereby (collectively, the "Class").

2.     Oklahoma Police alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Many of the facts relevant to Lead Plaintiff's allegations are known only by Defendants, or are exclusively within Defendants' custody or control. Lead Counsel's investigation included, among other things, review and analysis of: (i) TrueCar's public filings with the Securities and Exchange Commission (the "SEC"); (ii) in-depth research reports by securities and financial analysts; (iii) transcripts of TrueCar's conference calls with analysts and investors; (iv) presentations, press releases, and reports regarding the Company; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of TrueCar shares; (vii) interviews with former employees of TrueCar and other knowledgeable persons; and (viii) consultations with relevant experts. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

## II.     INTRODUCTION

3.     TrueCar is an internet-based company that purports to give consumers the "true" price, or market price, for new and used cars.  TrueCar's financial success

depends on its ability to obtain web traffic, leading to sales of cars, or "units," from its site.  Both prior to and during the Class Period, TrueCar stated that its ability to obtain web traffic and units depended heavily on its "affinity group marketing partners," or financial institutions and member organizations that, in exchange for marketing fees, exclusively direct their members to purchase a car through customized co-branded sites maintained by TrueCar.

4.     As TrueCar made clear in its SEC filings, the most significant of these affinity partners was the United States Automobile Association ("USAA"), which generated nearly one-third of the Company's annual units and therefore its revenues. In fact, USAA was so critical to the Company's success that the Company's SEC filings contained a risk factor devoted solely to USAA, warning that "USAA has a significant influence on our operating results."[1]  USAA was also TrueCar's largest shareholder, and a former senior executive of USAA—Defendant Christopher Claus—served as Chairman of TrueCar's Board throughout the Class Period.

5.     Significantly, TrueCar was responsible for hosting, maintaining and operating the co-branded car buying site for USAA—meaning TrueCar was necessarily directly involved in any updates or changes to the car buying site.  Even so, TrueCar's SEC filings stated that USAA had "broad discretion" over how that site was operated, marketed and promoted.  As a result, and because of USAA's crucial importance to the Company's financial success, TrueCar represented that if USAA were to use its "broad discretion" to make changes to the car buying site, "our revenue, business and financial results will be harmed."  Indeed, the filings expressly stated that if USAA made even a minor change to the website, such as adjusting the location of the link to the TrueCar car buying site, TrueCar's business would be harmed.

---

[1] Throughout this Amended Complaint ("Complaint"), unless otherwise stated, all emphasis is added.

6.     A month before the start of the Class Period, the risks that the Company had warned of pertaining to USAA fully materialized.  Former TrueCar employees confirmed that, by January 2017, USAA explicitly informed TrueCar that it had decided to significantly redesign the co-branded car buying website, that the redesign would be implemented by no later than June 2017, and that the changes were far more extensive than merely changing the location of the link to TrueCar's car buying service.  Specifically, USAA would now require its members to respond to numerous additional questions about their personal finances and monthly budgets before they could access the TrueCar site, in an effort to make sure its members could actually afford to purchase the cars.  As former TrueCar employees described in detail, this news prompted TrueCar to direct management of each of its departments Company-wide to hold internal all-hands-on-deck meetings starting in January 2017.  These meetings were specifically convened in an effort to grapple with the USAA website changes and their expected fallout:  negative responses from USAA members, resulting in dramatically lower traffic, units and revenues for TrueCar.    Indeed, there was no question Defendants[2] knew what the inevitable negative effect of the substantial USAA website changes would be.    These changes—which amounted to what Defendants would later refer to as a "significant website redesign"—would inevitably and profoundly impact TrueCar's unit and revenue growth.

7.     Despite this reality, during the Class Period, Defendants continued to deceptively warn investors in the Company's SEC filings of the mere "risk" that USAA might change its car buying website with TrueCar at some point "in the future"—giving investors the distinct impression that no such risk had yet materialized, when, in fact, it already had.  At the same time, Defendants repeatedly

[2] For purposes of the Exchange Act claims only, "Defendants" mean TrueCar, Defendant Chip Perry ("Perry"), Defendant Michael Guthrie ("Guthrie") and Defendant John Pierantoni ("Pierantoni").

represented the Company's "return" to double-digit unit growth in excess of 20% throughout the Class Period, which it told investors would continue for the balance of 2017 and would be driven in large part by TrueCar's key affinity partnership with USAA.  In reality, Defendants knew the exact opposite would occur:  namely, that when the significant USAA website changes were implemented in June 2017, TrueCar's traffic, unit sales, and revenues would materially decline.

8.     As TrueCar's stock skyrocketed by over 60% based on these misrepresentations (from approximately $13 per share to over $21 per share), Defendants took full advantage, engaging in significant insider sales that yielded tens of millions of dollars in ill-gotten gains.  Specifically, on April 26, 2017, the Company closed a secondary offering in which TrueCar sold only 1,150,000 shares of TrueCar common stock at $16.50 per share, realizing approximately $19 million, or just over 10% of the total proceeds from the offering.  In contrast, USAA and the selling shareholders—which included several entities affiliated with members of TrueCar's Board of Directors—realized approximately 90% of the proceeds from the offering, or $151.8 million.  Indeed, USAA—which knew that it would have TrueCar implement changes to the co-branded TrueCar car buying website that would significantly reduce TrueCar's traffic, units and revenue—sold 26% of its TrueCar holdings, realizing $51.7 million in proceeds, or 34% of the total proceeds from the offering.  While none of TrueCar's officers, including Defendants, sold any of their TrueCar stock in the secondary offering, this was only because they were subject to a 90-day Lock-Up Period that was scheduled to expire on July 25, 2017.

9.     By June 2017—and while investors remained unaware of USAA's material redesign of the co-branded car buying website—TrueCar implemented USAA's changes to the site, which almost immediately resulted in what Defendants knew would occur:  a significant decline in traffic, units and revenues from USAA members, and for TrueCar overall.  Former TrueCar employees confirmed that

Defendants were aware of this decline, as they were able to witness these declining metrics in "real time" via multiple internal Company databases.  Additionally, all USAA member complaints were routed internally to the Company's "Escalation Department," located at TrueCar's headquarters in Santa Monica, California.  Indeed, Defendants would later <u>admit</u> that they had witnessed the significant USAA shortfall immediately after the website changes were implemented, which, according to a former TrueCar employee, prompted a Company-wide "fireside" meeting—<u>attended by Defendant Chip Perry, TrueCar's CEO</u>—discussing the sharp downturn in USAA traffic.

10.    On July 17, 2017, TrueCar's stock price climbed to its peak of $21.75 per share, over 60% higher than its price at the beginning of the Class Period.  Approximately one week later, on July 26, 2017—<u>just one day after the Lock-Up Period expired</u>—Defendants Guthrie and Pierantoni and other Company insiders began selling enormous amounts of their TrueCar stock.  Specifically, within a week of the Lock-Up Period's expiration, these insiders collectively sold nearly 1 million TrueCar shares, realizing approximately $19 million in gross proceeds.

11.    Significantly, the largest seller was TrueCar's Chief Financial Officer ("CFO"), Defendant Guthrie, who sold over 730,000 TrueCar shares—or <u>54% of his total holdings</u>—realizing nearly $14 million in ill-gotten gains.  This contrasted sharply with Defendant Guthrie's pre-Class Period trading, <u>which was non-existent</u>.  Defendant John Pierantoni, TrueCar's Chief Accounting Officer, also sold substantial amounts of his TrueCar stock, amounting to 50% of his total holdings, realizing $1.2 million in gross proceeds.  Heavy insider selling continued through October 2017, just before the truth about the USAA website changes was revealed.  In total, insiders sold over 1.1 million TrueCar shares during the Class Period and received in excess of $21 million in gross proceeds.

12.     On November 6, 2017, when the Company released its earnings for the third quarter ended September 30, 2017, Defendants were forced to reveal the truth. TrueCar reported that, rather than experiencing record unit growth in excess of 20%, the Company's sales units attributable to USAA had <u>declined</u> by 5%, meaning the Company could not meet the guidance it had issued only three months prior.  To the astonishment of investors, Defendant Chip Perry, admitted for the first time that this shortfall was solely attributable to substantial changes USAA had made to the co-branded car buying website with TrueCar months ago—which Perry stated were so extensive they amounted to a "<u>significant website redesign</u>," causing "a decline in traffic, prospects, and units on USAA."  Significantly, Perry <u>admitted</u> that <u>TrueCar</u> "<u>saw [these] changes coming</u>," stating:  "<u>It wasn't like we were blind to them</u>."

13.     On this news, the Company's stock dropped precipitously, falling over 35%, or $5.76 per share, in a single day, to close at $10.58 per share on November 7, 2017 on heavy trading volume.

## III.    <u>JURISDICTION AND VENUE</u>

14.     The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), and under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §§ 77k, 77l, 77o).

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

16.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c) and Section 22 of the Securities Act 15 U.S.C. § 77v(a). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading

statements, occurred in substantial part in this District. Additionally, TrueCar's headquarters are located in this District.

17.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## IV.   EXCHANGE ACT PARTIES

### A.   Lead Plaintiff

18.   Lead Plaintiff Oklahoma Police is administrator of a multi-employer, cost-sharing defined benefit pension plan that provides participants with retirement, death and disability benefits.   Oklahoma Police covers substantially all police officers employed by the 141 municipalities and state agencies within the State of Oklahoma.  It has approximately $2.4 billion in assets and 5400 participants.  As set forth in its previously submitted certification, Oklahoma Police purchased TrueCar common stock on the NASDAQ during the Class Period and suffered damages as a result of the federal securities laws alleged herein.  *See* ECF No. 33-2.

### B.   Defendants

#### 1.   TrueCar

19.   Defendant TrueCar is an internet-based company that purports to offer users market pricing on new and used cars, and connects users with its network of "TrueCar Certified Dealers."  TrueCar is a Delaware corporation, headquartered at 120 Broadway, Suite 200, Santa Monica, California 90401.  As of December 31, 2016, TrueCar had 650 employees, with the majority located at the Company's main offices in Santa Monica and San Francisco, California, and Austin, Texas.

#### 2.   Victor "Chip" Perry

20.   Defendant Perry served as the Chief Executive Officer and President of TrueCar during the Class Period, and also served on the Company's Board of

Directors.  Perry replaced TrueCar's founder, Scott Painter, who announced his resignation as CEO in August 2015 after the Company experienced a mass exodus of dealers from its network.  During the Class Period, Defendant Perry made materially false and misleading statements and omissions during earnings calls and investor conferences, including on February 16, 2017, February 28, 2017, May 9, 2017, August 8, 2017, and September 7, 2017.  Defendant Perry also reviewed, approved and signed and certified TrueCar's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, and the Registration Statement in connection with the Company's April 26, 2017 common stock secondary offering ("the Offering"),[3] which contained materially false and misleading statements and omissions.

### 3.   Michael Guthrie

21.   Defendant Guthrie served as TrueCar's Chief Financial Officer from January 2012 through January 28, 2018, when he suddenly resigned for "personal reasons," and served as Interim Chief Operating Officer from September 2015 until December 2015.  During the Class Period, Defendant Guthrie made materially false and misleading statements and omissions during earnings calls and investor conferences, including on February 16, 2017, May 9, 2017, August 8, 2017, and September 7, 2017.  Defendant Guthrie also reviewed, approved and signed and certified TrueCar's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, and the Registration Statement in connection with the Offering, which contained materially false and misleading statements and omissions.

---

[3] The Offering was conducted pursuant to a shelf registration statement filed with the SEC on Form S-3, dated January 19, 2017 and declared effective on February 6, 2017 (the "Registration Statement"); a Prospectus filed with the SEC, dated January 19, 2017 (the "Prospectus"); and a Prospectus Supplement filed with the SEC, dated April 26, 2017 (the "Prospectus Supplement," and, together with the Registration statement and the Prospectus, the "Offering Documents").

1

### 4. John Pierantoni

2        22.     Defendant Pierantoni served as the Company's Chief Accounting

3   Officer during the Class Period, a role he held since 2013.  As of February 1, 2018,

4   Pierantoni began to serve as interim CFO of TrueCar.  During the Class Period,

5   Defendant Pierantoni reviewed, approved and signed TrueCar's quarterly and annual

6   filings with the SEC on Forms 10-Q and 10-K, and the Registration Statement in

7   connection with the Offering, which contained materially false and misleading

8   statements and omissions.

9        23.     Significantly, Defendants Perry, Guthrie and Pierantoni (the "Officer

10  Defendants")—along with TrueCar's General Counsel, Jeffrey Swart, who chaired

11  the committee with Defendant Pierantoni—were all members of TrueCar's

12  "Disclosure Committee" during the Class Period.  The Disclosure Committee met

13  "prior to the filing of each quarterly and annual report" during the Class Period, and,

14  according to its charter, was tasked with, in addition to ensuring the overall accuracy

15  of the Company's public filings, conducting "periodic inquiries with relevant

16  Company personnel possessing information potentially requiring disclosure."

17  ## V.   OVERVIEW OF THE FRAUD

18       ### A.   Background of TrueCar

19       24.     TrueCar is an internet-based company that promises to provide

20  consumers with the "TruePrice," or actual market price, of new and used cars.

21  Specifically, TrueCar allows consumers to search for the make and model of the car

22  they want, obtain market pricing data, and then connect with TrueCar's network of

23  Certified Dealers so that consumers can purchase their desired car for a guaranteed

24  price below the car's manufacturer's suggested retail price ("MSRP").  TrueCar runs

25  this platform both on its own branded website (TrueCar.com) and on customized co-

26  branded websites with "affinity group marketing partners," which include financial

27

28

institutions, membership-based organizations, and employee buying programs for large enterprises.

25.     TrueCar monetizes its business through fees paid to the Company from Certified Dealers for each "unit," or car, sold through the site.  As explained in the Company's SEC filings, "units" are "the number of automobiles purchased by our users from TrueCar Certified Dealers through TrueCar.com . . . or the car-buying sites we maintain for our affinity group marketing partners."  Certified Dealers either pay TrueCar a fee per each vehicle sold through TrueCar ($299 for new cars and $399 for used cars), or pay a subscription fee based on the actual number of cars sold through TrueCar.  During the Class Period, almost all of TrueCar's revenues (approximately 94%) were generated by unit sales.  Accordingly, TrueCar states in its SEC filings that "[w]e view units as a key indicator of the growth of our business."

26.     TrueCar makes clear in its SEC filings that its affinity partnerships, which are responsible for the "majority" of the car sales through its site, are "critical" to its unit growth and therefore its financial performance.  For example, the Company's SEC filings state:

> Our financial performance is substantially dependent upon the number of automobiles purchased from TrueCar Certified Dealers by users of the TrueCar website . . . Currently, <u>a majority of the automobiles purchased by our users were matched to the car-buying sites we maintain for our affinity group marketing partners</u>.  As a result, <u>our relationships with our affinity group marketing partners are critical to our business and financial performance</u>.

27.     Significantly, both before and throughout the Class Period, the most important of TrueCar's affinity partnerships by far was with USAA, the Company's largest shareholder and longest-standing affinity partner, that generated nearly one third of TrueCar's annual units and revenues in 2016.

**B.    TrueCar Was Highly Intertwined With, and Dependent On, Its Largest Affinity Partner and Largest Shareholder USAA**

28.    Both prior to and during the Class Period, TrueCar was highly intertwined with USAA, which played a significant role in directing TrueCar's business.  As one analyst stated, USAA was "absolutely pivotal to [TrueCar's] beginnings, opening doors to dealerships at inception."  Indeed, USAA has been TrueCar's largest shareholder since before it became a public company.  TrueCar was the first investment of USAA Ventures, a program USAA developed in 2010 for start-up investing.  USAA continued to own in excess of 25% of TrueCar up until its initial public offering in 2014.  At the outset of the Class Period, USAA remained the Company's largest shareholder, owning approximately 14% of TrueCar's common stock.

29.    USAA has also always had representation on TrueCar's Board of Directors.  From May 2012 through April 2014, the USAA Board representative was Vic Pascucci, head of Corporate Development at USAA and of the USAA Ventures program.  When Pascucci resigned in April 2014, Christopher Claus replaced him as the USAA representative on TrueCar's Board.  As stated by the Company's press release announcing Claus' appointment to the Board, Claus had a "distinguished 20-year career at USAA," holding "several senior financial and operating roles" through March 2014, "serving as the president of the Financial Advice and Solutions Group and as a member of USAA's Executive Council for 13 years."  While not mentioned on TrueCar's website or in its SEC filings, Claus also served as a Director of the USAA Real Estate Company—the "real estate investment arm of USAA," according to USAA's website—throughout the Class Period, from 2009 through the present day.  Significantly, Claus not only served on TrueCar's Board as the USAA representative, <u>he was elected Chairman of the TrueCar Board of Directors in February 2016</u>, and served in that role throughout the Class Period up to the present day.

30.     USAA is also TrueCar's most significant affinity partner, and has been since its inception.  As stated in TrueCar's SEC filings:  "The largest source of user traffic and unit sales from our affinity group marketing partners comes from the site we maintain for USAA."  Indeed, according to TrueCar's 2016 Form 10-K, <u>USAA generated 32% of TrueCar's annual revenues</u> that year, meaning 32% "of all units purchased by users from TrueCar Certified Dealers . . . were matched to users of the car-buying site [TrueCar] maintain[s] for USAA."  The 2016 Form 10-K stated that, for this reason, "USAA has a significant influence on our operating results."

31.     While the Company's SEC filings stated that USAA had "broad discretion in how the car buying site . . . [was] promoted and marketed on its own website," significantly, <u>TrueCar was responsible for "maintain[ing]" the co-branded site—<i>i.e.</i>, it hosted, managed and operated the car buying site for USAA</u>.  This meant that any changes USAA made to the car buying site would necessarily require TrueCar's involvement in order to implement them.  Additionally, because of USAA's critical importance to TrueCar's financial success, TrueCar's most senior executives—including Defendant Perry—had direct involvement in this task.  For example, Defendant Perry stated during the Company's November 3, 2016 3Q earnings call just prior to the Class Period that he personally worked with "<u>USAA's most senior executives and the team assigned to the day-to-day management of their car buying service</u>":

> One of the key differentiators that I always admired about TrueCar before I joined was the company's powerful affinity network.  USAA is simply the perfect partner for our business because of the scale and loyalty of their members . . . <u>I have had the good fortune of working with some of USAA's most senior executives and the team assigned to the day-to-day management of their car buying service</u>, and I'm excited about where we can take this partnership.

32.     Former TrueCar employees further confirmed that TrueCar's senior management worked closely with USAA on a "daily" basis.  For example,

Confidential Witness ("CW") 1,[4] a Consumer Support Specialist in the Company's Austin, Texas offices from March 2015 through March 2017 witnessed, on multiple occasions, senior TrueCar management "walking the room" with USAA representatives.  TrueCar's Austin office was its largest office outside of California, housing approximately 20% of the Company's 650 employees, including Brian Skutta, Executive Vice President of Dealer Sales and Service, and Bernie Brenner, TrueCar co-founder and Executive Vice President of Business Development and Strategy.  That office was also located only approximately one hour from USAA's headquarters in San Antonio, resulting in extensive interaction between USAA and TrueCar executives.  Indeed, CW 1 stated that she observed Brenner in particular meeting with USAA representatives at least five separate times in 2016-2017.  She also observed Wendy Tanner, former Vice President of Dealer and Consumer Support at TrueCar, interacting with USAA personnel on several occasions.

33.     CW 2, a former Senior Partner Development Manager for TrueCar from February 2016 through August 2016 in the Company's Santa Monica headquarters who managed over 180 of TrueCar's affinity partnerships, also confirmed that TrueCar had "daily" contact with USAA.  CW 2 stated that David Pributsky and Shane Stephens, an Executive Vice President and Vice President, respectively, in TrueCar's Partner Development department, were the primary contacts at TrueCar with USAA.  Megan Lotay, also in Partner Development, worked on the USAA account at TrueCar as well, before leaving in April 2017 to become an Executive Director at USAA.  CW 2 stated that Pributsky was based in the Company's offices in Santa Monica and reported to Defendant Perry, while Stephens, Pributsky's direct report, was based in the Company's Austin, Texas offices.  CW 2 stated that, according to her Partner Development team members, Stephens spent at least 75% of his time at USAA's headquarters in San Antonio, Texas.

---

[4] Former TrueCar employees are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to maintain their confidentiality.

34.     CW 3, a former Technical Product Manager for TrueCar in the Company's Austin, Texas offices from November 2015 through June 2017,  shared a work space close to Stephens, the Vice President in Partner Development who was responsible for the USAA account.  CW 3 learned through direct conversations with Stephens, who reported to Pributsky in Santa Monica, California that Stephens spent at least 75% of his time at USAA's headquarters in San Antonio, Texas.  CW 3 recalled that, on multiple occasions, Stephens stressed to CW 3 the importance of the USAA account and Stephens' required presence at USAA headquarters.

35.     The Services & Maintenance Agreement governing TrueCar's management of the car buying website for USAA, publicly filed with the SEC in 2014 (the "Services Agreement"), further showed the degree to which the two companies were intertwined.  For example, the Services Agreement required TrueCar to provide USAA with a "full-time program manager" who would be dedicated to overseeing maintenance of the car buying site.  USAA also gave specific directions concerning the conduct and quality of TrueCar employees who would be interacting with USAA members in connection with the car buying site, requiring TrueCar to (i) conduct regular drug tests on "each employee that will provide [s]ervices on USAA's premises unescorted by USAA"; (ii) direct TrueCar employees working on the site to comply with USAA's policies while on USAA's premises (including dress code and various detailed security policies); (iii) require TrueCar employees to attend orientation programs conducted by USAA on USAA's premises before performing any services on the car buying site; and (iv) conduct "thorough background check[s] on any [TrueCar] [e]mployees who will have access to [USAA member] [d]ata" prior to the employee performing any services on the site.  Additionally, any subcontractors used by TrueCar who would have access to USAA member data or USAA computing systems had to be "pre-approved by USAA."

36.     The Services Agreement also provided that TrueCar would maintain a call center at its Austin, Texas offices to respond to questions from USAA members about the car buying site.  The Services Agreement granted USAA full control over how the Austin call center would be operated.  For example, it stated that TrueCar would (i) utilize specific call scripts, subject to approval and changes by USAA, to use for calls with USAA members; (ii) submit a written "Calling Plan" to be approved by USAA detailing the allowed days and timeframes for calling USAA members; (iii) answer 80% of USAA members' calls within 30 seconds with a live voice; (iv) provide monthly "scorecards" to USAA showing, among other things, how fast calls were answered; (v) track, log, and escalate all USAA member complaints to USAA on a monthly basis; and (vi) maintain a quality monitoring program for calls with USAA members.  Additionally, TrueCar was required to provide USAA physical access to TrueCar's call center facilities "on both a scheduled and non-scheduled basis to monitor performance."   TrueCar was also required to allow USAA to "audit training sessions" for TrueCar employees and allow USAA to provide "culture training" to TrueCar employees who interacted with USAA members.

37.     In light of USAA's "broad discretion" over the car buying site, including how it was managed and promoted to USAA members, and USAA's critical contribution to TrueCar's annual units and revenues, TrueCar's SEC filings prior to the Class Period stated that "[c]hanges in [USAA's] promotion and marketing [of the car-buying site] have in the past and may in the future adversely affect the volume of user traffic we receive from USAA," which "could adversely affect our business and operating results in the future."  Those filings also stated that, if USAA were to use its broad discretion to change the car buying website in a way that "de-emphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed.  Indeed, the filings stated that such

harm had occurred in the past as a result of even minor changes USAA had made to the car buying website, namely a prior adjustment to "the location and prominence of the links to [TrueCar's] platform on [USAA's] web pages":

> [C]hanges in how USAA promotes and markets the car-buying site we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by USAA members. <u>For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform.</u> Should USAA or one or more of our other affinity group marketing partners decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, <u>our revenue, business and financial results will be harmed.</u>

38.    Significantly, although TrueCar had numerous affinity partners, USAA was the only affinity partner for which TrueCar made these specific warnings in its SEC filings, which were included in a "Risk Factor" heading devoted solely to USAA. Such statements underscored USAA's material influence on the Company's success, as well as the substantial financial harm TrueCar would incur as a result of any adverse change USAA may make to TrueCar's co-branded car buying website.

**C.    In Early 2017, TrueCar's Key Risk Pertaining to USAA Materialized:  USAA Implemented Significant Changes to the Co-Branded Car Buying Website**

39.    In or around January 2017, approximately one month before the start of the Class Period on February 16, 2017, the risks pertaining to USAA that TrueCar set forth in its SEC filings—namely, that USAA may use its "broad discretion" to change the co-branded car-buying website—materialized. Specifically, numerous former TrueCar employees confirmed that, by January 2017, USAA had informed TrueCar that it had significantly redesigned the co-branded car-buying site, and that the changes—which would require USAA members to answer a multitude of additional questions about their personal finances before being able to access the TrueCar car buying site—would be implemented by June 2017. This news prompted TrueCar to direct management in each of its departments Company-wide to conduct internal meetings with their staff to inform them of the USAA website redesign, and

to prepare them for what Defendants knew the negative impact of such dramatic changes to the car-buying website would be:  as acknowledged in the Company's own SEC filings, TrueCar's revenue, business and financial results would be materially and inevitably harmed.

40.     For example, CW 1, a former Consumer Support Specialist at TrueCar from March 2015 through March 2017 who was responsible for helping customers purchase cars through TrueCar's car buying site with USAA, described how, in late January 2017, she and numerous staffers from TrueCar's Consumer Support department were specifically informed by TrueCar's Consumer Support management during an internal meeting that USAA had decided to significantly redesign the co-branded car buying site, and that such redesign would cause a dramatic negative impact on the Company's business.

41.     The meeting occurred at the Company's Austin, Texas office, where CW 1 was based, and which primarily handled customer service and sales for TrueCar's affinity clients, including USAA.  Indeed, according to USAA's Services Agreement with TrueCar, the call center at the Company's Austin office was devoted to responding to calls from TrueCar customers who were USAA members. Additionally, and as set forth above, Brian Skutta, the Executive Vice President of Dealer Sales and Services at TrueCar, and Bernie Brenner, co-founder of TrueCar and Executive Vice President of Business Development and Strategy—including the management of TrueCar's affinity partnerships—were based in the Company's Austin, Texas office.

42.     According to CW 1, the meeting was led by Adrienn Colbert and Michelle Brazil, Consumer Support "Team Leads" at TrueCar who were responsible for guiding and monitoring the Consumer Support staffers in their dealings with USAA members.  Brandie Aldrich, former Senior Manager of Consumer Support at TrueCar and to whom Colbert and Brazil reported, also attended the meeting.

Aldrich reported to Wendy Tanner, former Vice President of Dealer and Consumer Support, who reported to Paul Edmonds, Senior Vice President of Dealer Marketing and Operations, who reported to Defendant Perry.   CW 1 recalled that other attendees included, among others, Consumer Support staffers Janey James, Edgar Sanchez, Patrice Love, Raymond Gonzales, and CW 4.

43.     At the meeting, Colbert and Brazil informed Consumer Support staffers that USAA had decided to significantly redesign the car buying website with TrueCar by requiring USAA members to answer a series of additional questions pertaining to their personal budgets and finances before they could access the car buying site.   CW 1 recalled that the particular changes USAA had decided to implement were shown via a "slide" or "presentation" providing specific "examples" of the questions that USAA would add, and that handouts were also provided.   "They (Colbert and Brazil) showed a mock of what the types of questions would look like."   Colbert and Brazil explained that TrueCar "was informed by USAA of the change," which USAA hoped would "match them [USAA members] better for what the member makes [earns]" and "push USAA members to use [USAA's] credit union for financing."

44.     Significantly, CW 1 recalled that a main focus of the January 2017 meeting was to prepare Consumer Support staffers for the known negative impact USAA's significant changes to the car buying site would have on TrueCar's customers and business.   In particular, CW 1 stated that it was understood by CW 1 and stated by others at the meeting, including senior managers, that the USAA website changes would not be well-received by USAA members and would have an adverse effect on TrueCar's bottom line.   CW 1 stated that this was because the additional steps USAA was adding, and the nature of the questions, were going to deter USAA members from wanting to continue to use the car buying site.   CW 1 recalled that Colbert and Brazil stated at the meeting that USAA members would

resist the additional questions, which would require USAA members to disclose "sensitive and personal" financial information, causing web traffic to "run slower." CW 1 stated that Colbert and Brazil commented:  "People [USAA members] are going to be upset [about the changes].  Don't be surprised when you start receiving more calls [from USAA members]."  In fact, CW 1 stated that Consumer Support staffers were provided with specific templates (called "Call Flow Sheets") that were designed to address sample complaints that were expected to be raised by USAA members in response to the changes.  The staffers were told to submit these reports online via the "Call Flow Sheets" to Colbert and Brazil, who would in turn forward them to the Company's Escalation Department, headed by Chad Cravens, at TrueCar's headquarters in Santa Monica.  Colbert and Brazil stated that TrueCar was "going to go through some rough times, but USAA is our biggest customer and we have to obey," as TrueCar could not "afford to lose the account."

45.     Significantly, CW 1 stated that this was not the only internal meeting held at TrueCar about USAA's significant redesign of the car buying website. Rather, there were "numerous" internal meetings taking place in or around January 2017 in which management from each department informed their staffers of the significant changes USAA was making to its car buying website with TrueCar.

46.     CW 4, another former TrueCar Consumer Support Specialist in the Company's Austin, Texas offices from December 2015 through mid-November 2017, provided an independent account corroborating the timing and substance of the internal meeting attended by CW 1.  CW 4 stated that, in early 2017, Colbert and Brazil, who were Consumer Support Team Leads, informed her and other Consumer Support staffers at an internal meeting at the Company's Austin, Texas office that USAA had decided to implement significant changes to its website later that year, and that those changes would consist of additional questions to USAA members about their personal budgets.  CW 4 likewise stated that it was generally understood

at this meeting that these changes would not be well-received by USAA members and would have an adverse effect on TrueCar's bottom line.

47. Significantly, CW 4 explained that because USAA is a vital customer for TrueCar and "dictates our company," USAA controlled TrueCar customer support procedures for USAA members. CW 4 stated that, as a result, at the meeting led by Colbert and Brazil—and as also described by CW 1—Consumer Support staffers were provided with a "template," or "Call Flow Sheet," that they were instructed to follow for expected USAA member complaints in response to the USAA website redesign. Colbert instructed Consumer Support staffers to "make sure you are careful (when dealing with upset USAA members)" and "stick to the script" that was provided.

48. CW 5, another former Consumer Specialist for TrueCar in the Company's Austin, Texas offices from November 2015 through November 2017, also independently corroborated the internal meetings described by CW 1 and CW 4. CW 5 stated that, around early February 2017, Sigourney Samaripa, the Consumer Support Team Lead for CW 5's team and who was also a USAA member, informed CW 5 of USAA's significant redesign of the car buying website, and also informed her of the precise changes that USAA was making—namely, requiring USAA members to answer a series of additional questions pertaining to USAA members' monthly expenses and details about car ownership. Through conversations with Samaripa and Colbert, CW 5 learned of the meeting that had taken place earlier that year in which Colbert and Brazil issued warnings to Consumer Support staffers on the expected negative response from USAA members in connection with USAA's changes to the car buying website. CW 5 also believed that an email had been circulated to Consumer Support staffers by the Team Leads informing them of the same. CW 5 stated that "it was clear from the beginning" that

the USAA's website changes were "intrusive" to USAA members and "would not be good" for TrueCar.

49.     Former employees also confirmed that, on the technological side, TrueCar would have been informed of any changes to the car buying website it maintained for USAA months before those changes were "made live."  CW 2, a former Senior Partner Development Manager at TrueCar's offices in Santa Monica from February 2016 through August 2016 who managed over 180 affinity partner relationships at TrueCar, stated that—based on her attendance at bi-weekly and monthly Partner Development team meetings at TrueCar's Santa Monica offices led by Pributsky, who managed the affinity relationship with USAA—TrueCar's creative team worked closely with USAA on the car buying site, and would have been involved in any process to change the site since it was "owned and operated by TrueCar."  CW 2 further stated that the significant changes to the website that USAA implemented here—*i.e.*, adding several additional pages to the car buying process consisting of questions requiring data input from users—would have taken at least "months to add," and would have required countless meetings and "lots of testing before it was made live" so both parties could give input.

50.     Indeed, CW 6, a former Software Engineer for TrueCar's mobile apps who worked in the Company's Austin, Texas offices from November 2015 through March 2018, stated that Marco Santini, his supervisor and current Senior Director of Development at TrueCar, attended "numerous meetings" with individuals from USAA throughout early to mid-2017.  Santini reported to Chris Denend, Senior Vice President of Software Engineering who was based in the TrueCar's Santa Monica offices, who reported to Tommy McClung, current Chief Technology Officer, who reported to Defendant Perry.

51.     In addition to the above, Defendants Perry, Guthrie and Pierantoni knew USAA had decided to significantly change the co-branded car buying website

because, as members of TrueCar's Disclosure Committee, <u>they were required to inform themselves of any such material change</u>.  The Company's Disclosure Committee met "prior to the filing of each quarterly and annual report" in order to ensure the accuracy of TrueCar's public filings.  Significantly, according to the Company's Disclosure Committee charter, <u>this required the Officer Defendants to conduct "periodic inquiries" with Company personnel to determine whether they possessed any information requiring disclosure</u>.  Such inquiries would have necessarily involved conversations with Company personnel who managed TrueCar's affinity partnership with USAA, which, as set forth above, was critical to TrueCar's success and accounted for nearly one-third of the Company's revenues.  Thus, prior to each of the Company's public filings after January 2017, Defendants Perry, Guthrie and Pierantoni were required to inform themselves of USAA's significant redesign of the car buying website, and to actively discuss the material impact it would have on TrueCar's business during each of their Disclosure Committee meetings held throughout the Class Period.

52.     Despite these facts, Defendants never told investors about USAA's "significant website redesign" during the Class Period, and did not change the risk language in the Company's subsequent SEC filings to inform investors that this previously potential and highly significant risk had come to fruition.  Instead, Defendants gave investors the exact opposite impression:  that no such risk had transpired, and that the Company's affinity partnership with USAA was poised to generate record and accelerating unit and revenue growth for TrueCar in 2017 in excess of 20%, even as Defendants knew that such growth would not and could not occur.  Tellingly, at the same time Defendants inflated TrueCar's stock price with their misrepresentations, Defendants Guthrie and Pierantoni sold material amounts of their TrueCar stock, obtaining tens of millions of dollars in proceeds from illegal

insider sales as TrueCar's share price peaked in the months before the truth came out.

### D. Throughout the Class Period, Defendants Concealed USAA's Website Changes While They Represented TrueCar's Affinity Partnership with USAA as a Key Driver of Unit Growth in 2017

53. At the same time Defendants were arranging internal meetings to inform TrueCar staffers about USAA's significant redesign of the car buying site and the dramatic impact it would have on the Company's units and revenues once it was implemented in June 2017, Defendants were telling investors the exact opposite: that the Company would achieve record unit and revenue growth in 2017 because the USAA channel would "absolutely . . . grow and grow nicely."

54. For example, on the February 16, 2017 Q4 earnings call, Defendants touted USAA's "record" double-digit unit growth. Specifically, Defendant Guthrie stated, in response to an analyst question asking what the "bigger drivers of growth [are] here," and specifically whether TrueCar's affinity partnership with USAA would continue to generate growth in 2017:

> [W]e want to keep growth going in all of our channels, TrueCar, USAA, and the branded channel, and we see a lot of opportunities to continue growing there . . . [E]very channel grew well this quarter, this past quarter. I think we're optimistic about all of them going into 2017 . . . You look at the USAA channel, we had great growth in the fourth quarter. We had a record in the month of December. As I said in the call, we're 11 years into the partnership and still think there is just quite a bit that we can do together with our partners at USAA . . . And so, even though that's a very large channel, we still look at the penetration rates there and we know that they're reasonably low . . . So there's much more work to do there.

55. Similarly, at the February 28, 2017 JMP Securities Technology Conference two weeks later, Perry represented that USAA would "absolutely" grow and be a key source of unit growth for TrueCar in 2017:

> So, one of the characteristics of our business is we have a branded business, which is a little over 40% of our unit volume . . . But we also have a partner affinity business, with USAA being our largest partner . . . That affinity channel in the last fiscal year really started to grow pretty substantially . . . And as we look at where the unit growth comes

<u>from next year, we absolutely expect all of our channels to grow and grow nicely, TrueCar-branded, USAA</u>**.**

56.     Analysts reacted positively to this news.  For example, a Morgan Stanley report entitled:  "TRUEly a Good Quarter" stated that "USAA grew 16% y/y, the fastest since 2015.  We view these channels as key drivers to profitable growth as they . . . play an outsized role in driving future earnings growth."  Craig-Hallum Capital Group LLC issued a report entitled:  "TRUE Continues to Exceed Expectations," raising its target price for TrueCar from $14 to $20 per share, and commenting that:  "New CEO Chip Perry has overseen a number of changes that appear to have radically changed [TrueCar's] direction, including . . . refocusing on the highly profitable affinity channel."  RBC Capital Markets issued a report commenting that the Company's overall unit growth of 19% was its "fastest growth in five quarters," and that its "unique visitor" growth, which measured TrueCar's overall web traffic, was expected to be driven by the Company's "key relationship with USAA."

**E.     In the Midst of Their Misrepresentations, Defendants Engage in Substantial Insider Sales—While Continuing to Tout TrueCar's Accelerating Unit Growth**

57.     In the midst of these misrepresentations, TrueCar closed a substantial secondary public offering, selling over a million shares of stock to unsuspecting investors at artificially inflated prices.  Moreover, both Defendants Guthrie and Pierantoni engaged in substantial insider sales, realizing tens of millions of dollars in proceeds as TrueCar's stock price climbed toward its Class Period peak.

58.     First, on April 26, 2017, TrueCar conducted a secondary offering (the "Offering") of 10.35 million shares of its common stock at a price of $16.50 per share.  In the Offering TrueCar sold 1,150,000 shares, realizing approximately $19 million in proceeds, or just over 10% of the total proceeds from the Offering.  The other selling stockholders—which included USAA and several entities directly

affiliated with TrueCar's Directors—reaped the remaining 90%, amounting to $151.8 million in proceeds.

59.     Specifically, USAA sold 3,123,343 of its 12,175,335 TrueCar shares, or 26% of its total TrueCar holdings at the Offering price of $16.50 per share, receiving $51.7 million in proceeds—34% of the total proceeds from the Offering. Entities affiliated with TrueCar Directors Steven Dietz, Ion Yadigaroglu and Abhishek Agrawal also sold substantial amounts of TrueCar stock in the Offering, collectively selling approximately 5.6 million TrueCar shares and collecting more than $90 million in proceeds, or over 50% of total proceeds from the Offering. While Defendant Perry, Guthrie and Pierantoni did not sell in the Offering, this was only because they were subject to a 90-day Lock-Up Period that prevented them from selling any shares until July 25, 2017.

60.     On the May 9, 2017 Q1 first quarter earnings call, Defendant Guthrie lauded the results of the "successful public offering," and celebrated the Company's accelerating unit growth after its "return[] to double-digit growth rates on units and revenue in Q4 of last year." Specifically, Guthrie represented that TrueCar was "now generating 20% plus growth on the top-line," with overall revenue growing 22% and units growing a record 24% compared to the first quarter the prior year.

61.     Defendants also raised TrueCar's unit and revenue guidance, while continuing to highlight USAA as a "great grower" for the Company. As Defendant Perry stated:

> So we would, certainly, be remiss if we didn't call out the partner organization of TrueCar over the last few quarters, they had a great first quarter. The unit numbers coming out of our partner channel both USAA, which had really healthy growth of 16% in the first quarter, we did 16% in the fourth quarter on a year-over-year basis at USAA, in a year where the growth rate was only 8%. So that's been a great grower for us.

62.     Analysts reacted positively to these statements. Stephens issued a Research Brief raising TrueCar's price target from $17 per share to $22 per share,

stating:  "TRUE posted solid 1Q17 results that were in-line with the update they gave around a recent follow-on offering and upped guidance for 2017.  All three channels (TrueCar, USAA, and other affinity partners) and essentially all of TRUE's operating metrics were solid in the period, and we believe strong results in the seasonally strong 2Q/3Q periods and credible plans to expand TRUE's business model will continue to move the stock higher."  RBC Capital Markets issued a report stating "[r]esults were strong and TRUE raised its FY17 guide more than the Q1 beat," stating "importantly units continue to accelerate" at a "record Q1 level" in excess of 20%.  Craig Hallum issued a report raising the target price for TrueCar from $20 per share to $23 per share, and stating that Q1 marked a "return to 20+% y/y revenue growth."

63.    In or around June 2017, as USAA had directed months earlier, TrueCar implemented USAA's significant redesign of its co-branded car-buying website with TrueCar.  Specifically, as described above, USAA added several additional steps that USAA members would have to complete before being able to access the TrueCar platform, including a series of questions requesting sensitive personal and financial information from members about their credit and monthly budgets.

64.    As former TrueCar employees confirmed, the fallout Defendants had known would occur once USAA's "significant website redesign" was implemented was almost immediate.  CW 4, a former TrueCar Consumer Support specialist from December 2015 through mid-November 2017, stated that, by June 2017, she witnessed a spike in USAA complaints specifically relating to the additional questions pertaining to members' personal budgets.  These complaints were documented internally and routed to the Company's Escalation Department at TrueCar's headquarters in Santa Monica via the online "Call Flow Sheets."

65.    CW 5, another former TrueCar Consumer Support specialist from November 2015 through November 2017, similarly stated that in "early spring" she

received a call from a "high ranking" USAA member complaining about "why are they (USAA) now asking all these questions about personal finances," which made the member feel "uncomfortable."   CW 5 notified Consumer Support Team Lead Colbert of this complaint via an online "Call Flow Sheet," which CW 5 said Colbert was then responsible for forwarding to the Company's Escalation Department at TrueCar's headquarters in Santa Monica.

66.   CW 6, a former TrueCar Software Engineer from November 2015 through March 2018, stated that in early summer 2017, his superior—Marco Santini, the Director of Development at TrueCar—told CW 6's team, which was responsible for development of TrueCar's mobile apps, that "pipeline numbers (for the USAA account) are down."   Following this meeting, and leading up to the November 6, 2017 earnings call, CW 6 and other team members received periodic updates from Santini about the USAA account's continued poor performance, which were provided both verbally and through the Company's internal communications system (Slack).

67.   CW 7, a former Support Analyst for TrueCar from January 2016 through February 2018, also stated that, within a few weeks of the rollout of the USAA website changes, she witnessed "significantly less traffic" through TrueCar's website due to USAA members opting not to purchase vehicles through USAA/TrueCar.

68.   Finally, CW 8, a former Consumer Support Specialist for TrueCar in the Company's Austin, Texas offices from October 2016 through December 2017, stated that, following implementation of USAA's changes to the car buying website—which she stated occurred in "early 2017"—she witnessed a sudden increase in complaints coupled with a reduction in USAA user traffic.  Significantly, <u>CW 8 further stated that she attended a "fireside" Company-wide meeting in August</u>

2017, which Defendant Perry attended, discussing the downward trend in user traffic to the USAA car buying website.

69.     Former employees also stated that TrueCar staffers and senior management had "real time" access to declines in web traffic and sales from USAA members via internal Company databases.  Specifically, CW 9, a former Director of Trade Operations from February 2017 through March 2018 at TrueCar's office in Austin, Texas, stated that TrueCar leadership—including CW 9—had real time access to monitor website traffic, leads and sales on affinity partner sites, including the USAA account, via the internal database known as "Dashboard."  CW 4 also stated that TrueCar staffers had real time access to this information through "Dashboard."  CW 3, a Technical Product Manager for TrueCar from November 2015 through June 2017, similarly stated that "Dashboard" allowed TrueCar staffers to monitor in real time the amount of "clicks" and purchases made through the TrueCar car buying website as well as affinity partner sites.  Additionally, CW 5 stated that "Turbo System" was another internal database utilized internally at TrueCar that likewise provided "real time" verifications of vehicle purchases by USAA members from TrueCar Certified Dealers.

70.     Indeed, Defendant Guthrie himself had stated, at a May 25, 2017 analyst conference, that TrueCar Certified Dealers gave the Company direct access to their "dealer management software," which showed all car sales at the dealership in real time, including for the Company's affinity partner sites:  "What that allows us to do is see every transaction that flows through the dealership.  We know every transaction that comes through either our branded business or through our affinity business."

71.     On July 17, 2017—at which point the dramatic fallout from the significant USAA website changes was well underway, while investors remained ignorant—TrueCar's stock peaked at its Class Period high of $21.75 per share, or

64% higher than its price at the beginning of the Class Period (when the stock closed at $13.24 per share).

72.     Roughly one week later, on July 25, 2017, the 90-day Lock-Up Period which Defendants Guthrie and Pierantoni were subject to as part of the April 26, 2017 Offering expired.  Tellingly, the day after its expiration, Defendants Guthrie and Pierantoni began selling substantial amounts of their TrueCar stock—which was still trading near its Class Period high (between $19-$21 per share)—along with Company officers Neeraj Gunsagar (CMO) and Jeffrey Swart (General Counsel). Collectively, within the week after the Lock-Up Period expired, these Company officers sold nearly 1 million TrueCar shares and collected approximately $19 million in gross proceeds.



73.     Significantly, Defendant Guthrie, the Company's CFO who was in charge of monitoring TrueCar's unit sales and revenues, was the largest insider seller.  Indeed, Guthrie sold 737,916 of his TrueCar shares—over half of his total

holdings (54%)— within days of the Lock-Up Period expiring, realizing nearly $14 million in gross proceeds alone.

| TrueCar Officers Obtain $19 Million in Insider Sales Immediately After Lock-Up Expires | | | |
|---|---|---|---|
| Insider | Date of Sale | Shares | Gross Proceeds |
| Guthrie (CFO) | 7/26/17-8/4/17 | 737,916 | $13,962,608 |
| Pierantoni (CAO) | 7/26/17 | 55,895 | $1,107,501 |
| Gunsagar (CMO) | 7/26/17 | 158,160 | $3,051,785 |
| Swart (GC) | 7/26/17 | 34,863 | $690,860 |
| Total: | | 986,834 | $18,812,754 |

## F.   After Dumping Their Stock, Defendants Continue to Mislead the Market About TrueCar's Affinity Relationship With USAA

74.   Even after Defendants Guthrie and Pierantoni profited handsomely from these insider sales, when the Company released its second quarter results on August 8, 2017 and filed its Form 10-Q on August 9, 2017, Defendants did not reveal the truth to investors.

75.   To the contrary—and notwithstanding the fact that, as Defendants would later admit, USAA had already implemented what the Company called a "significant website redesign"— the 10-Q continued to deceptively warn of the "risk" that if USAA were to change the co-branded car buying site at some point "in the future," the Company's business would be significantly harmed.

76.   Remarkably, even though Defendants would soon admit that USAA's significant redesign of the car buying website had been implemented weeks prior— and that Defendants had "really started to see [the USAA shortfall]" as a result of the changes before August 8, 2017— Defendant Guthrie claimed on the Company's earnings call that day that TrueCar was currently seeing "continued strong growth in units" in the third quarter that was "really fantastic." Guthrie stated that the Company had embedded this "really fantastic" unit growth in its annual 2017 guidance, which it raised for the second time. Defendants also issued strong

guidance for Q3 2017, with Defendant Guthrie representing that <u>the Company would continue to achieve a growth rate in excess of 20% based on what he was "seeing"</u>: "<u>[W]e are already seeing signs of high unit growth rates as our July results come in</u>. As a result, <u>we expect Q3 units to be in the range of . . . 20% to 22% year-over-year growth</u>."

77.     Analysts reacted positively to the Company's second quarter results. RBC Capital Markets issued a report increasing its target price for the Company from $22 per share to $23 per share, noting that TrueCar's "[f]undamental growth story remains intact" and that the "[k]ey here was that the FY17 guidance raises were slightly bigger than the Q2-beat—i.e., these were clean raises."  JP Morgan issued a report stating that the Company's strong Q3 guidance of unit and revenue growth in excess of 20% "represents solid and consistent momentum in our view."  Craig Hallum issued a report maintaining its raised target price of $23 per share, stating: "we came away with the same takeaway as previous quarters:  TRUE is on its way to becoming a much bigger company and player in the digital automotive market," and noting that key metrics "all trended well," including unit growth of 26% and 18 consecutive quarters of used car unit growth "in excess of 20%."  Stephens issued a report stating "[w]e believe that  [] impressive unit growth over the last six quarters is a strong indicator of TRUE's healthy core business . . . [that] will allow the Company to post impressive top line growth," and "we see no real LT impact to TRUE's growth potential."

78.     However, as Defendants would soon admit, rather than witnessing "continued strong" and "really fantastic" unit growth in the third quarter, in reality, the units generated by USAA—which typically accounted for nearly a third of the Company's annual units and revenues—<u>were rapidly and significantly declining</u>.

## VI.   <u>THE TRUTH COMES OUT</u>

79.    As late as September 7, 2017—only three weeks before the end of the third quarter—Defendants continued to represent that the Company's unit growth was "in the mid-20% range," stating "units are growing nicely."  However, when TrueCar released its third quarter results on November 6, 2017, Defendants were forced to reveal that USAA's significant changes to the car buying website had profoundly and negatively impacted TrueCar's business, units and revenues.  During the third quarter earnings call, and to the surprise of investors, Defendants announced that, rather than achieving unit growth in the "mid-20% range" in the third quarter as Defendants had represented, USAA units had <u>declined</u> by 5% in the third quarter, after what Defendant Perry described as a "normal sort of <u>growth trend with USAA that we've had for many, many years, double-digit growth, consistently</u>."  Defendants further announced that, despite having raised TrueCar's annual guidance just three months prior, they were now forced to lower that guidance because they would no longer be able to meet it.

80.    Defendants also were forced to disclose that, despite 18 consecutive quarters of growth in excess of 30% in the Company's used car business, in the third quarter, used car units grew only 16%.  Defendant Guthrie stated that "<u>[t]he year-over-year contraction in units at USAA contributed to the deceleration in used car growth versus last quarter</u> as our USAA channel has the highest ratio of used car sales."  Defendants additionally stated that TrueCar's "unique visitors," which measured its overall web traffic, had fallen to a growth rate of only 1%—as one analyst commented, this was the Company's slowest growth rate in that metric since 2013.

81.    Defendant Perry admitted for the first time that these significant financial misses were a direct result of the fact that USAA had "<u>significant[[ly] []redesigned</u>" the co-branded car-buying website:

> While I'm generally pleased with our execution in the third quarter, we did have our challenges. Recently, <u>USAA launched a significant website redesign</u> . . . [T]he new USAA Car Buying experience has introduced several new steps in the process and new content related to total cost of [car] ownership before the member is linked to the Car Buying Service powered by TrueCar . . . <u>For Q3 . . . we saw a decline in traffic, prospects and units [for] USAA</u>.

82.    Perry further explained why these "new steps" caused such a sharp decline in USAA user traffic, stating:  "<u>[A] feel for affordability was put in front of members, and that caused them to pause, perhaps not continue, perhaps come back at a later date</u>." Defendant Guthrie similarly stated:

> If you just look at the numbers and it's really clear, I think we really had [] a traffic issue as Chip [Perry] was saying.  Whether very well financially qualified or not, <u>all of the [USAA] members went through an experience that made it much more difficult to get through the car buying service</u>.  And so if you look at traffic versus prospects versus units, a very, very large decline in traffic, much smaller in terms of the declines in prospects and only 5% down on units.

83.    Tellingly, Perry did not deny that TrueCar, who was responsible for maintaining the car buying site for USAA and worked with USAA on issues regarding that site on a day-to-day basis, knew about the USAA website changes well in advance of their implementation.  In fact, he admitted just the opposite:

> So the changes in the [USAA] user experience involved inserting some steps, questions and also content related to vehicle affordability and cost of ownership.  <u>So we saw these coming.  It wasn't like we were blind to them</u>.

84.    While in the next breath Perry claimed that TrueCar and USAA realized the "downward effect on our numbers" only "after we saw [the website changes] launched," this was clearly not true.  As TrueCar's own Form 2016 10-K and 2017 Form 10-Qs explicitly acknowledged, if USAA were to change its website in any way—even in a fairly minor way, such as changing the location of the links to the TrueCar car buying service—"our revenue, business and financial results <u>will be harmed</u>."  Defendants and TrueCar therefore knew without question that, in the event of a "<u>significant website redesign</u>," the impact on the Company's financial results

would be profound, and inevitable.  Indeed, as former TrueCar employees' detailed accounts confirmed, by January 2017, Defendants knew full well that the significant changes USAA had decided to make to the car buying website would cause a dramatic reduction in units and revenue, prompting the Company to require every department to hold internal all-hands-on-deck meetings to prepare for the changes and their fallout.

85.    Moreover, when an analyst asked Defendants "when exactly within the quarter did the USAA shortfall hit the numbers," Defendant Guthrie, although claiming the Company had a "pretty good" July, admitted that "[w]e really started to see [the shortfall] in August"—the same month he had told investors during the August 8, 2017 2Q earnings call that "[w]e're seeing, as the third quarter starts, continued strong growth in units."  Guthrie also admitted that TrueCar and USAA, as part of their affinity relationship, worked closely together in determining what would occur with regard to the co-branded website, making clear that TrueCar could not have been ignorant to the website changes.  Specifically, Guthrie stated:  "We don't have any dealings without [USAA's] consent," and "[w]e work with them on a daily basis and we're well-connected."

86.    Upon revelation of the surprising news that USAA had implemented a significant website redesign that profoundly reduced TrueCar's unit and revenue growth, the Company's stock plummeted, falling over 35%, or $5.76 per share, in a single day, closing at $10.58 per share on November 7, 2017 on heavy trading volume.

87.    Several analysts reacted negatively to TrueCar's financial fallout caused by USAA's significant and unexpected website redesign.  For example, RBC Capital Markets issued a report stating "TRUE posted weak results and lowered FY guidance following poor performance from their USAA partner," stating that USAA's "significant website redesign," which the report stated was launched in

June 2017, "adversely impact[ed] traffic, prospects ad unit sales through the [TrueCar] platform, which were down 5% y/y."

88.    Similarly, Cowen issued a report stating: "TRUE's 3Q17 results were largely disappointing, as revenue and units missed our consensus estimate and mgmt. . . .guidance given lower units from USAA, a key channel partner." The report commented that USAA "launched a new website experience in 3Q17 which effectively created more friction points for the USAA member during the car buying process, leading to traffic declines . . . This dynamic will persist into 4Q17." Additionally, Morgan Stanley issued a report stating "TRUE pointed to issues in their USAA channel (units sold down 5% y/y v. 2Q of +17%) as USAA redesigned their website . . . These additional steps in the process led to a decrease in UVs [unique visitors], Prospects and Units sold." The report also commented that unique visitor growth had slowed to 1%, "the slowest quarterly growth since 2013 (as far back as we have)," jeopardizing the Company's long-term growth plan.

## VII.   POST CLASS-PERIOD EVENTS CONFIRM DEFENDANTS' FRAUD

89.    Post Class-Period events further confirmed Defendants' fraud. Specifically, in the months after the truth was revealed, Defendants made several additional public admissions confirming the significance of the launch of USAA's website redesign in mid-2017, and that the changes USAA implemented severely impacted TrueCar's financial results—so much so that the Company's decline in unit growth persisted through the first and second quarters of 2018.

90.    For example, at the November 8, 2017 RBC Capital Markets Technology conference, Perry elaborated on why the USAA website changes caused a sharp decline in TrueCar's web traffic and units from USAA, stating they had created considerable "friction" between USAA members and TrueCar:

> A big chunk of the audience that makes [TrueCar] number one is a flow of car buyers that come from USAA . . . and what they did in the third quarter was put in place a new experience layer on their side related to advising members about what kind of car they should buy and including

a lot of [information on] car affordability.  So it put some friction that didn't used to exist between us and them.

91.  Not long after TrueCar revealed its difficulties with USAA, on February 1, 2018, TrueCar announced that on January 28, 2018, Defendant Guthrie—who had made nearly $14 million off insider sales during the Class Period—notified the Company that he was resigning as CFO due to "personal reasons."

92.  On February 15, 2018, the Company announced its fourth quarter and full year results for 2017.  Significantly, USAA produced only 58,975 units, down 14% from the prior year.  In other words, the decline in TrueCar's units attributable to USAA, which prior to the third quarter of 2017 had exhibited double-digit growth for "many years," was now exhibiting double-digit deceleration.

93.  The sharp decline in unit growth persisted through the first and second quarters of 2018—despite USAA's purported efforts to make further changes to the co-branded website in an effort to decrease the "friction" the original changes had caused.  For example, in the first quarter of 2018, TrueCar reported that USAA units were still down 5% from the prior year—*i.e.*, the same percentage decline that had occurred in the third quarter of 2017.  Defendant Pierantoni, who assumed the role of CFO after Guthrie's departure, stated at the May 15, 2018 JP Morgan Global Technology conference that this continuing decline was directly attributable to the changes USAA had made to the TrueCar car buying site in mid-2017:

> With respect to the first quarter and why it's a little bit lighter than where it was in the past for last year is in part driven by our USAA partner.  USAA is our biggest affinity partner.  Last year, they changed their experience with TrueCar and created some friction in their marketplace which we've subsequently worked through with them.

94.  Additionally, when the Company recently released its second quarter results on August 9, 2018, Defendant Perry reported on the Company's earnings call that USAA units were still "down 5% year-over-year," again due to the USAA

website changes in mid-2017.  Moreover, overall unit growth was just 3%—a far cry from the consistent double-digit unit growth "in the mid-20% range" Defendants had touted during the Class Period.

95.     These post Class Period events confirm that the USAA website changes were highly material, causing a lasting and significant decline in TrueCar's unit growth and financial results.

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

96.     Defendants made materially false and misleading statements or omitted to state material facts during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.     Defendants knew by the start of the Class Period that USAA, the Company's largest source of revenue and "cornerstone for TrueCar's business" was making "significant" changes to their co-branded car buying website that would have a material adverse effect on the volume of purchases generated by USAA and prevent that growth from continuing. Indeed, Defendants knew that changes to USAA's website would negatively and drastically impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform."

97.     As a result of the foregoing, Defendants' statements about TrueCar's business, operations, and prospects were false and misleading and/or lacked a reasonable basis. These material misstatements had the cause and effect of creating in the market an unrealistically positive assessment of TrueCar's business.

### A.     Fourth Quarter and Full Year 2016

98.     On February 16, 2017, the first day of the Class Period, Defendants caused the Company to issue a press release announcing strong financial results for the fourth quarter and full year 2016.  In the Company's media release, Defendant Perry represented that the Company was "re-accelerating our top-line growth while

also improving our margins" and would "<u>continue to drive double-digit rates of unit and revenue growth for some time</u>."  Defendant Guthrie added that Defendants had "<u>set the stage for strong growth and margin expansion over the next few years</u>."

99.    Defendant Perry continued to stress TrueCar's continuous growth on the Company's February 16, 2017 fourth quarter earnings call, stating: "At this point, I can say that I am very confident that <u>we now clearly understand and have our hand placed securely on the practical levers that will enable us to continue to drive double-digit rate of unit and revenue growth for some time</u>."

100.    Furthermore, Defendant Guthrie, in addition to discussing how USAA sales were at "an all-time high," represented that TrueCar's prosperous relationship with USAA would only continue to grow.  Specifically, Guthrie stated that "[a]s we enter our 11th year as partners with USAA, <u>there is still much to do</u>," adding that "<u>we see a lot of opportunities to continue growing there</u>."

101.    Defendant Guthrie, in response to an analyst inquiry regarding the Company's "bigger drivers of growth"—and specifically whether TrueCar's affinity relationship would continue to generate growth in 2017—Defendant Guthrie represented the following concerning TrueCar's partnership with USAA:

> . . . You look at the USAA channel, we had great growth in the fourth quarter. We had a record in the month of December. And as I said in the call, we're 11 years into the partnership and <u>still think there is just quite a bit that we can do together with our partners at USAA, to continue to make car buying better and better for their members</u>. And so, even though that's a very large channel, we still look at the penetration rates there and we know that they're reasonably low, both on new car and used car. <u>So there's much more work to do there</u>.

102.    At the JMP Securities Technology Conference on February 28, 2017, Defendant Perry reiterated these points, stating: "we also have a partner affinity business, with USAA being our largest partner . . . That affinity channel in the last fiscal year really started to grow pretty substantially . . . <u>And as we really look at</u>

where the unit growth comes from next year, we absolutely expect all of our channels to grow and grow nicely, TrueCar branded, USAA."

103.   The statements in paragraphs 98 through 102 above were materially false and misleading and omitted to state material facts.  Specifically, USAA was not going to be one of the Company's "bigger drivers of growth" with "opportunities to continue growing there."  In reality, USAA had already decided to significantly change its co-branded website with TrueCar with a "significant website redesign" that would adversely affect the Company's financial results.  As former employees confirm, by January 2017, TrueCar "was informed by USAA of the change" and "it was clear from the beginning" that the changes "would not be good" for TrueCar. Indeed, as Defendant Perry admitted: "we saw these [changes] coming. It wasn't like we were blind to them."  Moreover, Defendants knew that changes to USAA's website would negatively and drastically impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform."  In fact, these changes were far more significant than merely changing the location of links to the TrueCar platform.  Thus, Defendants had no reasonable basis to attribute future unit growth to USAA and knew of undisclosed facts that seriously undermined the validity of the statements made.

104.   On March 1, 2017, Defendants Perry, Guthrie, and Pierantoni caused the Company to file its Form 10-K with the SEC for the year ended December 31, 2016 ("2016 Form 10-K"). The 2016 Form 10-K was signed by Defendants Perry, Guthrie, and Pierantoni.  The 2016 Form 10-K contained certifications signed by Defendants Perry and Guthrie.

105.   The 2016 Form 10-K described how "a significant reduction in the number of cars purchased . . . by members of [TrueCar's] affinity group marketing

partners would reduce [the Company's] revenue and harm [TrueCar's] operating results":

> [S]everal aspects of our relationship with affinity groups <u>might change</u> in a manner that harms our business and financial performance, including: [. . .] affinity group marketing partners <u>might de-emphasize</u> the automobile buying programs within their offerings, resulting in a decrease in the number of transactions between their members and our TrueCar Certified Dealers. [. . .] <u>If our relationships with affinity group marketing partners change our business, revenue, operating results and prospects may be harmed</u>.

106. Further, in describing how "[a]ny adverse change in our relationship with United Services Automobile Association, or USAA, <u>could</u> harm our business," the 2016 Form 10-K stated:

> USAA has broad discretion in how the car-buying site we maintain for USAA is promoted and marketed on its own website. Changes in this promotion and marketing have in the past and <u>may in the future adversely affect the volume of user traffic we receive from USAA. Changes in our relationship with USAA or its promotion and marketing of our platform could adversely affect our business and operating results in the future</u>.

107. The 2016 Form 10-K also specifically represented that, if USAA were to use its broad discretion to change the car buying website in a way that "de-emphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed:

> [C]hanges in how USAA promotes and markets the car-buying site we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by USAA members. For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform. <u>Should USAA</u> or one or more of our other affinity group marketing partners decide to <u>de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed</u>.

108. The statements in paragraphs 104 through 107 above were materially false and misleading and omitted to state material facts. Specifically, Defendants' representations to investors of what would happen <u>if</u> USAA, "the Company's single largest source of unique visitors and unit sales from affinity group marketing

partners," were to change its co-branded website "in the future" were materially false and misleading.  USAA had already decided to change the co-branded website with a "significant website redesign" that Defendants knew, or disregarded with deliberate recklessness, would "adversely affect [TrueCar's] business and operating results." As former employees confirm, by January 2017, TrueCar "was informed by USAA of the change" and "it was clear from the beginning" that the changes "would not be good" for TrueCar.  Indeed, as Defendant Perry later admitted: "we saw these [changes] coming. It wasn't like we were blind to them."  Moreover, Defendants knew that changes to USAA's website would negatively and drastically impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform." In fact, these changes were far more significant than merely changing the location of links to the TrueCar platform.  Thus, Defendants had no reasonable basis to represent that no changes in the Company's relationship with USAA had occurred because they knew of, or disregarded with deliberate recklessness, undisclosed materially adverse facts that seriously undermined the validity of Defendants' representations.

**B.     Statements Regarding the Company's April 2017 Offering**

109.   On or about April 26, 2017, TrueCar completed the Offering of 10.35 million shares of TrueCar common stock at an offering price of $16.50 per share, generating approximately $170,775,000 million in gross proceeds.  In the Offering, USAA sold 2,723,777 of its 12,175,333 beneficially owned shares, reducing its beneficial ownership in the Company from 13.6% to 10.4%. USAA also sold an additional 408,566 shares in connection with the underwriters' exercise in full of their overallotment option to purchase additional shares of common stock.

110.   The Registration Statement for the Offering was signed by Defendants Perry, Guthrie and Pierantoni.  In the Company's Offering Documents, Defendants

made the same misrepresentations made in the Company's 2016 Form 10-K, as described above in ¶¶ 104-107, regarding the Company's relationship with USAA and changes to USAA's platform and marketing efforts. These statements continued to be false and misleading for the reasons described above in ¶ 108..

111. Additionally, among other documents, the Offering Documents incorporated by reference the Company's 2016 Form 10-K and February 16, 2017 Form 8-K, which included the Company's fourth quarter and full year 2016 earnings press release. Accordingly, the false and misleading statements included in the Company's 2016 Form 10-K and fourth quarter and full year 2016 earnings press release were incorporated by reference therein. These statements continued to be false and misleading for the same reasons as described above in ¶¶ 103, 108.

C. **First Quarter 2017**

112. On May 9, 2017, the Company issued an earnings press release announcing strong financial results for first quarter 2017 ended March 31, 2017 and raising TrueCar's guidance for the full year 2017. Defendant Guthrie represented that Defendants were "pleased with the financial results in the first quarter of fiscal 2017 and the momentum we are building as we head into the seasonally strongest part of our year."

113. On TrueCar's May 9, 2017 first quarter earnings call, Defendant Guthrie continued to stress the Company's positive future prospects and growth: "While we still have plenty of work to do, I'm pleased to say that we are starting 2017 with significant momentum." Additionally, Defendant Perry represented that USAA, "which had really healthy growth," was a "great grower" for the Company.

114. The statements in paragraphs 112 through 113 above were materially false and misleading, when made and omitted to state material facts. Specifically, USAA was not going to be a "great grower" for the Company. In reality, Defendants knew, or disregarded with deliberate recklessness, that USAA had decided to

significantly change its co-branded website with TrueCar—changes that would dramatically reduce the volume of purchases generated by USAA. As former employees confirmed, by at least January 2017, TrueCar "was informed by USAA of the change" and "it was clear from the beginning" that the changes "would not be good" for TrueCar.  Indeed, as Defendant Perry admitted: "we saw these [changes] coming. It wasn't like we were blind to them." Moreover, Defendants knew that changes to USAA's website would negatively and materially impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform." In fact, these changes were far more significant than merely changing the location of links to the TrueCar platform.  Thus, Defendants had no reasonable basis to attribute future unit and revenue growth to USAA because they knew of, or disregarded with deliberate recklessness, undisclosed materially adverse facts that seriously undermined the validity of Defendants' representations.

115.   On May 10, 2017, Defendants caused the Company to file with the SEC its Form 10-Q for first quarter of 2017 ("1Q 2017 Form 10-Q"), which was signed by Defendants Guthrie, Perry, and Pierantoni. In the Company's 1Q 2017 Form 10-Q, Defendants made the same misrepresentations made in the Company's 2016 Form 10-K, as described above in ¶¶ 104-107, regarding the Company's relationship with USAA and changes to USAA's platform and marketing efforts.   These statements continued to be materially false and misleading for the reasons described above in ¶ 108.

### D.   <u>Second Quarter 2017</u>

116.   On August 8, 2017, the Company issued its earnings press release for the second quarter 2017 and on August 9, 2017, Defendants Perry, Guthrie and Pierantoni caused the Company to file a Form 10-Q for the second quarter of 2017

("2Q 2017 Form 10-Q"), which was signed by Defendants Guthrie, Perry and Pierantoni.    By this time, USAA had implemented what Defendants would themselves call a "significant redesign" of the car buying site, and as Defendants would admit, the "USAA shortfall [had] hit the numbers" by August.

117.   Remarkably, in the 2Q 2017 Form 10-Q, Defendants made the same misrepresentations made in the Company's 2016 Form 10-K, namely that if USAA were to change the car buying website "in the future," TrueCar's "revenue, business and financial results will be harmed."

118.   These statements were materially false and misleading, and omitted material facts when made.  Specifically, Defendants' representations to investors of what would happen if USAA were to change their co-branded website "in the future" was false because, as Defendants would soon admit, by August 2017, USAA had already significantly redesigned the car buying website, and had implemented its significant redesign weeks prior, such that the "USAA shortfall [was] hit[ting] the numbers."  Thus, Defendants' representation of the "risk" that changes to USAA's website "may in the future adversely affect the volume of user traffic we receive from USAA" was clearly false, as that risk had without question materialized.

119.   In addition, Defendant Perry continued to emphasize the Company's prospects and growth in the Company's August 8, 2017 earnings release, stating: "The momentum that we have been building over the past few quarters at TrueCar is continuing quite nicely . . . We're growing well . . . we're expanding our business; and we're producing operating leverage all while making key investments for the long term."

120.   The August 8, 2017 press release also updated the Company's guidance for the third quarter 2017, stating that "[u]nits are expected to be in the range of 265,000 to 270,000" and "[r]evenues are expected to be in the range of $85.0 million to $87.0 million."

121.   Guidance for the full year 2017 was also raised: "[u]nits are expected to be in the range of 975,000 to 985,000" and "[r]evenues are expected to be in the range of $325.0 million to $329.0 million."

122.   Moreover, on TrueCar's August 8, 2017 second quarter earnings call, Defendants continued to mask the Company's issues with USAA's website change, failing to disclose that USAA's co-branded website with TrueCar had already undergone its "significant website redesign," that had and would continue to profoundly reduce TrueCar's overall traffic, unit sales, and revenues.

123.   Defendant Guthrie added that "[i]t's been a great first half of 2017.  And we're excited about <u>continuing to expand and grow our business in the second half</u> . . . our dealer network is able to close on a record number of end market prospects generated by our TrueCar branded channel, <u>USAA</u> and other <u>high-growth partners</u> such as Chase and Sam's Club."

124.   Furthermore, on the second quarter earnings call, Defendant Guthrie represented "<u>high unit growth rates</u>," stating: "And finally, we are already seeing signs of high unit growth rates as our July results come in. As a result, we expect Q3 units to be in the range of [265,000 to 270,000] or 20% to 22% year-over-year growth."

125.   In response to analyst inquiry, Guthrie further noted "continued strong growth in units," stating:

> Of all the metrics, I'd say I don't think we could be much happier about the unit numbers than we are. And we just have really produced really fantastic unit growth. <u>We're seeing, as the third quarter starts, continued strong growth in units that's embedded in the guidance that we gave you on units and it's embedded in the guidance that we gave on units for the year as a whole in addition to Q3.</u>

126.   The representations Defendants made in paragraphs 119 through 125 above were materially false and misleading, and omitted material facts when made. Specifically, USAA was not going "to expand and grow [TrueCar's] business in the

second half" of 2017.   The truth was <u>exactly the opposite</u>. Indeed, rather than witnessing unit growth in the third quarter, Defendants were now witnessing that the units generated by USAA—which typically accounted for nearly a third of the Company's annual units and revenues—<u>were rapidly declining</u>.   As Defendant Guthrie explicitly admitted, by August, TrueCar's revenues has already been materially impacted by the "significant website redesign."   Defendants thus had no reasonable basis to represent 20% to 22% year-over-year unit growth.   Defendants knew, or disregarded with deliberate recklessness, that the raised outlook for 3Q 2017 and FY 2017 did not reflect the reality of the impact caused by USAA's website change. The guidance issued was materially false and misleading because at that time Defendants knew that as a result of the material changes to USAA's website, units generated through the USAA website were materially declining.

127.   On September 7, 2017, Defendants Guthrie and Perry presented at the Citi Global Technology Conference.   Defendants Guthrie and Perry stressed the importance of unit growth and how it was a vital metric that was closely followed. Specifically, Defendant Perry represented that unit growth would continue, stating: "<u>unit growth is really the most important metric</u> in our business because -- and <u>you're seeing that grow in the mid-20% range now. We'll continue to grow nicely</u> because of conversion and closed rate improvements."

128.   Moreover, in discussing how Defendants "do a fairly good job forecasting units" and are "more focused on the units side of our business, especially in the last 1.5 years to 2 years," Defendants Perry and Guthrie both assured investors that "<u>units are growing nicely</u>."

129.   The representations that Defendant made in paragraphs 127 through 128 were materially false and misleading, and omitted material facts when made. Specifically, units were not "growing nicely" and growth was not going to be in the mid-20% range.   The truth was <u>exactly the opposite</u>.   Indeed, rather than witnessing

unit growth three months after the website change was implemented, Defendants were witnessing that the units generated by USAA—which typically accounted for nearly a third of the Company's annual units and revenues—were rapidly declining. As Defendant Guthrie admitted: "[w]e really started to see [the shortfall] in August. In September, the drop was fairly significant." Thus, Defendants had no reasonable basis for their statements and knew of undisclosed facts that seriously undermined the validity of the statements made. Defendants knew as a result of issues with the USAA website change that units were not growing, but rather were materially declining and that TrueCar would fail to meet its represented units range for the third quarter.

## IX. DEFENDANTS CAPITALIZED ON THEIR FRAUD THROUGH MASSIVE AND SUSPICIOUSLY TIMED INSIDER SALES, SUPPORTING A STRONG INFERENCE OF SCIENTER

130. Defendants Guthrie and Pierantoni, the Company's CFO and CAO, respectively—along with several other Company insiders—capitalized on Defendants' fraud by engaging in massive and suspiciously timed insider sales, collectively selling over 1.1 million TrueCar shares and raking in gross proceeds in excess of $21 million during the Class Period.

131. As set forth above, by January 2017, USAA informed Defendants that it was changing the co-branded car-buying website maintained by TrueCar. That same month, TrueCar filed a shelf registration statement for its April 26, 2017 secondary offering, in which the Company sold 1,150,000 shares and realized approximately $19 million in proceeds, while USAA and Company insiders—including entities affiliated with TrueCar Directors Dietz, Agrawal and Yadigaroglu—sold approximately 8.8 million shares, realizing over 80% of the proceeds from the offering, or over $145 million. While the Officer Defendants did not sell any TrueCar stock in the Offering, they were prevented from doing so by a 90-day Lock-Up Period scheduled to expire on July 25, 2017.

132.   On July 17, 2017, TrueCar's stock price reached its Class Period high of $21.75 per share, or 64% higher than the beginning of the Class Period. Approximately one week later, on July 26, 2017—the day after the Lock-Up Period expired, and when TrueCar stock was still trading near its peak value (between $19-21 per share)—several TrueCar insiders, including Defendants Guthrie and Pierantoni, began selling substantial amounts of their TrueCar shares, and heavy selling continued through October 2017, shortly before the truth about the USAA website changes was revealed in early November 2017.  Aside from Defendants Guthrie and Pierantoni, the selling insiders included Neeraj Gunsagar (Chief Marketing Officer), Jeffrey Swart (General Counsel) and Brian Skutta, the Company's Executive Vice President of Dealer Sales at TrueCar—*i.e.*, the department directly in charge of monitoring TrueCar's unit sales.[5]  As the chart below shows, these insiders collectively sold approximately 1.1 million TrueCar shares during this time period, grossing over $21 million in proceeds.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[5] While the insider sales by Guthrie, Pierantoni, Gunsagar and Swart were made pursuant to 10b5-1 trading plans, these officers simultaneously adopted the plans during the Class Period on May 12 and 18, 2017, and months after they knew, or disregarded with deliberate recklessness, that USAA had informed TrueCar about the significant website redesign.  Moreover, these plans permitted the officers to sell unusually large amounts of TrueCar stock as soon as the 90-day Lock-Up Period expired on July 25, 2017.  Although Skutta was also subject to the 90-day Lock-Up Period, he did not sell his TrueCar shares pursuant to a 10b5-1 trading plan.

| TrueCar Officers Obtain a Total of Over $21 Million in Insider Sales Before the Truth Comes Out | | | |
|---|---|---|---|
| Date | Insider | Shares | Gross Proceeds |
| 7/26/2017 | Guthrie | 70,353 | $1,392,117 |
|  | Pierantoni | 55,895 | $1,107,501 |
|  | Gunsagar | 70,182 | $1,389,608 |
|  | Swart | 34,863 | $690,861 |
| 7/27/2017 | Guthrie | 146,888 | $2,774,511 |
|  | Gunsagar | 87,978 | $1,662,180 |
| 7/28/2017-8/4/2017 | Guthrie | 520,675 | $9,794,980 |
| 9/6/17-9/7/2017 | Brian Skutta | 117,410 | $1,997,228 |
| 9/18/2017 | Gunsagar | 10,442 | $172,941 |
|  | Pierantoni | 3,964 | $65,653 |
| 10/2/2017 | Gunsasgar | 1,096 | $17,295 |
| 10/3/2017 | Pierantoni | 2,663 | $41,786 |
| 10/15/2017 | Gunsagar | 1,882 | $28,649 |
| TOTAL: |  | 1,124,291 | $21,135,310 |

133.   Significantly, the bulk of these insider sales—amounting to $18.8 million, or roughly 80% of the total proceeds insiders received from the sales— occurred within a week of the 90-day Lock-Up Period expiring on July 25, 2017, when TrueCar stock was trading closest to its Class Period high.  Tellingly, Defendants Guthrie and Pierantoni, and Company officers Skutta and Gunsagar, exercised stock options for these sales that were not set to expire for another six years—with certain of the stock options Guthrie exercised not set to expire for another nine years.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /



1
2
3
4
5
6
7
8
9
10
11
12



13

14. Additionally, all of these insiders sold substantial percentages of their TrueCar holdings, with Defendants Guthrie and Pierantoni, and Company executive Skutta, selling 50% or more of their respective TrueCar holdings. Each of these insiders' total sales and gross proceeds during the Class Period, and the percentage of their TrueCar holdings that they respectively sold, are as follows:

| TrueCar Officers Sell Substantial Percentages of Their TrueCar Holdings | | | |
|---|---|---|---|
| Insider | Total Shares Sold | Total Gross Proceeds | Percentage of Holdings Sold |
| Guthrie | 737,916 | $13,961,608 | 54% |
| Pierantoni | 62,522 | $1,214,940 | 50% |
| Gunsagar | 171,580 | $3,270,673 | 38% |
| Swart | 34,863 | $690,861 | 26% |
| Skutta | 117,410 | $1,997,228 | 50% |

135.   As the above charts show, Defendant Guthrie—who sold over half of his holdings in the few days after the Lock-Up Period expired, and at prices near TrueCar's Class Period high—reaped approximately $14 million in gross proceeds from his insider sales alone, the most of all of the insider sellers by far.   Not surprisingly, Defendant Guthrie also made the most false statements during the Class Period, representing the Company's accelerating unit growth driven by the USAA affinity partnership—purportedly causing him to raise the Company's unit and revenue guidance during the Class Period, twice—despite knowing there was no way TrueCar could ever achieve the raised guidance because of the significant USAA website changes that would soon go into effect.

136.   Additionally, Defendant Pierantoni, who was TrueCar's Chief Accounting Officer and, along with Defendant Guthrie, signed TrueCar's SEC filings falsely warning of the "future" risk that USAA "may" change its website "in the future"—when in fact, that risk had long ago materialized—also sold 50% of his holdings, reaping gross proceeds of $1.2 million.

137.   Significantly, <u>all</u> of these insiders' Class Period sales contrasted starkly with their sales prior to the Class Period.  Most strikingly, Defendant Guthrie <u>did not sell any TrueCar stock</u> in the twelve months before the Class Period.  Swart likewise sold no TrueCar stock during that time.  While Defendant Pierantoni, Gunsagar and Skutta sold some of their TrueCar stock in the year prior to the Class Period, these sales were dwarfed by their Class Period sales listed above.  Specifically, Pierantoni sold only 3,769 TrueCar shares in November 2016, for gross proceeds of $45,095—versus the $1.2 million Pierantoni grossed from his Class Period sales of 65,222 TrueCar shares.  Gunsagar sold 5,000 TrueCar shares in November 2016 for gross proceeds of $63,850, which was a far cry from his Class Period sales of 171,580 TrueCar shares for approximately $3.3 million in gross proceeds.  Finally, Skutta

sold 4,,081 shares in November 2016 for gross proceeds of $52,277, significantly less than his Class Period sales of 117,410 shares grossing nearly $2 million.



138.   In sum, the staggering amount of these insiders' sales, their suspicious timing—*i.e.*, beginning immediately after the Lock-Up Period expired, occurring near the Class Period high, and continuing until shortly before the truth came out in early November 2017—support a strong inference of illegal insider trading and Defendants Guthrie's and Pierantoni's scienter.  That inference is bolstered by the fact that (i) each of these insiders sold large percentages of his TrueCar holdings, with Defendants Guthrie and Pierantoni selling half or more of their total holdings; (ii) the insiders sold in concert with each other, with 80% of the sales occurring simultaneously in late July 2017, immediately after the Lock-Up Period expired and soon after the USAA website changes were implemented;  and (ii) <u>all</u> of these insiders' Class Period sales were dramatically out of line with their sales (or lack thereof) in the twelve months prior to the Class Period.

## X.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

139.   As alleged above, numerous facts raise a strong inference that Defendants knew, or were deliberately reckless in disregarding, the true facts regarding USAA's "significant website redesign," and the dramatic impact it would have on TrueCar's revenues, units and financial results.   These facts include, in addition to the allegations set forth above, the following:

140.   *Former TrueCar employees provided detailed facts confirming that, by early 2017—before the start of the Class Period—USAA informed Defendants of the significant website redesign, which Defendants knew would cause a dramatic decline in TrueCar's traffic, units and revenues.*   As set forth above, in late January 2017, TrueCar directed management of each of its departments to hold internal meetings with staffers to inform them of USAA's significant website redesign that would be implemented by June 2017, and the expected negative fallout it would cause to TrueCar's bottom line.   ¶¶ 39-50.   Former employees described how, at the Company's internal meeting for the Consumer Support department, staffers were shown presentations detailing the exact changes USAA would implement, which consisted of a series of additional questions USAA members would be asked about their personal finances before they could access the TrueCar car buying site.   They were also provided with "Call Flow Sheets," or template forms that were specifically designed for the expected influx of USAA member complaints in response to the changes.   Indeed, management was clear that USAA's significant changes to the car buying site would hurt TrueCar's USAA traffic and therefore its financial results. No less than three former employees—CWs 1, 4 and 5—provided detailed accounts independently corroborating the timing and substance of the Consumer Support meeting, which was attended by members of senior management, including Brandie Aldrich, former Senior Manager of Consumer Support.   *See id.*   In light of this, Defendants were clearly informed about USAA's significant website redesign—and

the particulars of what that redesign would involve—long before it was scheduled to be implemented.  Indeed, as Defendant Perry admitted once the truth was revealed:  "[W]e saw [the USAA website changes] coming.  It wasn't like we were blind to them."

141.  *TrueCar acknowledged in its own SEC filings that even minor changes to the USAA car buying site would significantly impact the Company's financial results.*  TrueCar explicitly stated in its SEC filings that "[s]hould USAA . . . decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed."  Those filings also provided a specific example of a relatively minor change to the car buying site by USAA that previously had a significant impact on the Company's financial results, stating:  "For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform."  ¶ 37.   In light of the fact that the changes here amounted to, as Defendants admitted, a "significant website redesign," there was no question Defendants knew the changes would profoundly and adversely affect the Company's financial results.

142.  *TrueCar was responsible for hosting, managing and operating the car buying website for USAA.*  As the Company's own SEC filings disclosed, as part of its affinity partnership with USAA, TrueCar was in charge of "maintaining" the car buying website for USAA—meaning that, as outlined in the Services Agreement between TrueCar and USAA, TrueCar was in charge of hosting, managing and operating the site.  ¶¶ 31-35.  This meant that, as confirmed by former TrueCar employees, TrueCar would have been directly involved in any alterations affecting the car buying site, and would have had to have been informed of such changes well in advance of their implementation.  ¶¶ 49-50.  For example, CW 2, former Senior Partner Development Manager at TrueCar's offices in Santa Monica, stated that

TrueCar's creative team worked closely with USAA on the car buying site, and would have been involved in any process to change the site since the site was "owned and operated by TrueCar."  CW 2 further stated that the particular changes USAA implemented here would have taken at least "months to add," requiring countless meetings between the two companies and "lots of testing before it was made live."  Indeed, CW 6, a former TrueCar Software Engineer, stated that his superior Marco Santini—the Senior Director of Development at TrueCar—had attended "numerous meetings" with USAA personnel throughout early to mid-2017.  *See id.*

143.  *TrueCar had a highly intertwined relationship with USAA.*  Aside from managing the car buying website for USAA, TrueCar's relationship with USAA was highly intertwined.  ¶¶ 28-38.  According to analysts who followed TrueCar, USAA was "pivotal to [TrueCar's] beginnings," as it was its main investor at the Company's inception, and remained its largest shareholder—owning 14% at the outset of the Class Period—throughout the Class Period.  USAA also had long had representation on TrueCar's Board, with Defendant Claus becoming the USAA Board representative in April 2014.  Two years later, Defendant Claus was elected as Chairman of TrueCar's Board, a role he held throughout the Class Period.  ¶¶ 28-31.  Additionally, as the Services & Maintenance Agreement between TrueCar and USAA showed, and as former TrueCar employees confirmed, USAA largely "dictated" TrueCar's business, providing detailed directions on how TrueCar was to manage the car buying site.  Specifically, USAA mandated that TrueCar drug test and conduct thorough background checks of its employees who had access to USAA member data or who interacted with USAA members, allow USAA to make random physical visits of TrueCar's facilities, and require its employees to attend USAA orientations and culture training sessions before they could work on the car buying site.  Defendants otherwise admitted that, even at the executive level, TrueCar interacted with USAA on a day-to-day basis.  ¶¶ 32-35.  In light of USAA's

extensive involvement in TrueCar's business, there is no question TrueCar and its executives were well informed about USAA's decision to significantly redesign the car buying site.

144. *USAA was critically important to TrueCar's business.* As TrueCar acknowledged in its SEC filings, USAA was "[t]he largest source of user traffic and unit sales from our affinity group marketing partners," accounting for 32% of all units in 2016. TrueCar's SEC filings stated that, as a result, "USAA has a significant influence on our operating results."

145. *The Officer Defendants' roles on TrueCar's Disclosure Committee are probative of scienter.* During the Class Period, each of the Officer Defendants served on the Company's Disclosure Committee, which held meetings prior to the filing of TrueCar's quarterly and annual reports during the Class Period to ensure their accuracy. Significantly, the duties of Disclosure Committee members included, among other things, making periodic inquiries to relevant Company personnel about whether there were any changes to TrueCar's business that would require disclosure. Such inquiries would have necessarily included inquiries to TrueCar employees who managed the Company's USAA affinity partnership, which accounted for nearly a third of TrueCar's annual revenues, about whether USAA had decided to change anything regarding the car buying site.

146. *Defendants made repeated public statements representing USAA's contribution to the Company's growth, claiming it would consistently achieve unit and revenue growth in excess of 20% throughout 2017.* Defendants Perry and Guthrie repeatedly touted not only the significance of its affinity partnership with USAA, but how that partnership would be a key driver of the Company's accelerating unit and revenue growth—allowing that growth to consistently remain in excess of 20%—for the remainder of 2017. ¶¶ 53-78. These statements demonstrate that Defendants closely monitored unit growth (which they publicly

acknowledged they monitored in real time, ¶ 70), viewed it as critical, and were incentivized to give investors the impression that it would remain at the record "mid-20%" range.

147.   *Defendants had "real time" access to the Company's sharp decline in USAA traffic and units during the Class Period.*   As multiple former TrueCar employees confirmed, Defendants had internal access to USAA traffic and unit data through multiple Company databases, including "Dashboard" and "Turbo System," and closely monitored this information, which was critical to TrueCar's success, in "real time."   ¶¶ 69-70.   Defendants therefore witnessed the dramatic and sharp decline in USAA traffic and revenues that former TrueCar employees confirmed occurred immediately after USAA's significant website redesign was implemented in June 2017.   ¶¶ 63-70.   Indeed, Defendant Guthrie admitted after the truth about the significant USAA website redesign was revealed that he had contemporaneously witnessed USAA unit growth sharply fall in August 2017.   ¶ 85.   Additionally, as CW 8 stated, senior management had in fact held a "fireside" meeting that month—which Defendant Perry attended—to discuss "downward trend" meaning the dramatic declines in traffic, units and revenues Defendants were observing.   ¶ 68.

148.   *Defendant Guthrie's and Pierantoni's extensive and suspiciously timed insider trading is highly probative of scienter.*   As set forth above, Defendants Guthrie and Pierantoni each sold half or more of their total TrueCar holdings, with the majority of those sales occurring <u>in the week after the 90-day Lock-Up Period following the April 26, 2017 Offering expired</u>.   By that time, TrueCar had implemented USAA's significant website redesign, though investors did not know it yet.   Significantly, Defendant Guthrie alone obtained nearly $14 million in proceeds from his sales of TrueCar stock.   ¶¶ 130-138.   Guthrie and Pierantoni were required to review and sign an acknowledgement that they had read and understood TrueCar's Code of Business Conduct and Ethics, which outlines TrueCar's

prohibition on insider trading.  Thus, Defendants Guthrie and Pierantoni knew that selling their shares while in possession of material non-public information violated U.S. securities laws and TrueCar's Code of Business Conduct and Ethics.

149.  *Defendant Guthrie's abrupt resignation is probative of scienter.*  On January 28, 2018, only a few months after Defendant Guthrie profited off substantial and suspiciously timed insider sales to the tune of $14 million—and less than three months after the truth was revealed about the USAA website redesign and its impact on TrueCar's business in November 2017—Defendant Guthrie abruptly resigned from his position as CFO of the Company, citing "personal reasons."

150.  *The fact that Defendants knew about USAA's significant website redesign and its impact in January 2017 but revealed nothing until they were forced to do so in the third quarter of 2017 is probative of scienter.*  Despite being informed by USAA about the significant website redesign months in advance of its implementation, Defendants did not inform investors.  Defendants instead continued to deceptively warn of USAA changing the car buying website as a substantial "risk" that had not yet occurred.  Defendants revealed the truth only when they were forced to, in the third quarter of 2017 when they could no longer hide the impact of the USAA website changes on TrueCar's financial results.  Tellingly, prior to that time, Defendants obtained tens of millions of dollars from their insider sales as a result of the market's ignorance of the significant USAA website changes and TrueCar's resulting inflated stock price.

151.  *Defendants' misrepresentations were material.*  As set forth above, and as Defendants themselves acknowledged in their public filings, USAA was critical to TrueCar's success, comprising 32% of its overall units and revenues on an annual basis.  Defendants also referenced USAA as being a key affinity partnership that set it aside from its peers in a highly competitive industry.  Defendants' scheme to

conceal a significant change in that key relationship that would profoundly impact TrueCar's unit and revenue growth was unquestionably material.

## XI.   LOSS CAUSATION

152.   Throughout the Class Period, the price of TrueCar common stock was artificially inflated as a result of Defendants' materially false and misleading statements identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of TrueCar common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of TrueCar common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of TrueCar common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

153.   By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of TrueCar's business.  Defendants' false and misleading statements had the intended effect, and caused TrueCar common stock to trade at artificially inflated levels throughout the Class Period, with shares of TrueCar common stock closed as high as $21.56 per share on July 14, 2017.  On November 6, 2017, the last trading day before Defendants' fraud began to be revealed, TrueCar common stock traded at $16.34 per share, the last closing price prior to indication of issues with TrueCar's most important affinity relationship, USAA.

154.   Defendants' after market disclosures on November 6, 2017 revealed to the market the false and misleading nature of Defendants' statements and omissions.  On that day, as described above, TrueCar revealed that USAA had implemented a

significant website redesign that profoundly reduced TrueCar's unit and revenue growth.

155. In response to Defendants' disclosures, the price of TrueCar common stock precipitously declined. The Company's share price plummeted by over 35%, closing down $5.76 per share from $16.34 per share on November 6, 2017 to $10.58 per share on November 7, 2017, wiping out over $580 million in market capitalization in one day, on unusually heavy trading volume.

156. Analysts were stunned by the Company's admissions and negatively reacted to TrueCar's financial fallout caused by USAA's significant and unexpected website redesign. For example, RBC Capital Markets issued a report stating "TRUE posted weak results and lowered FY guidance following poor performance from their USAA partner," because USAA's "significant website redesign," which the report stated was launched in June 2017, "adversely impact[ed] traffic, prospects ad unit sales through the [TrueCar] platform." Morgan Stanley similarly issued a report on TrueCar, stating "TRUE pointed to issues in their USAA channel (units sold down 5% y/y v. 2Q of +17%) as USAA redesigned their website . . . These additional steps in the process led to a decrease in UVs, Prospects and Units sold." Cowen issued a report stating that "TRUE's 3Q17 results were largely disappointing, as revenue and units missed our consensus estimate and mgmt. guidance given lower units from USAA, a key channel partner," and noted that the website changes "effectively created more friction points for the USAA member during the car buying process, leading to traffic declines . . . This dynamic will persist into 4Q17."

157. As shown, the drastic and continuing decline in TrueCar's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's stock price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## XII.  <u>PRESUMPTION OF RELIANCE</u>

158.  At all relevant times, the market for TrueCar common stock was efficient for the following reasons, among others:

a.      TrueCar's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.      As a regulated issuer, TrueCar filed periodic public reports with the SEC and the NASDAQ;

c.      TrueCar regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.      TrueCar was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the market place;

159.  As a result of the foregoing, the market for TrueCar's common stock reasonably and promptly digested current information regarding the Company from all publicly-available sources and reflected such information in the Company's common stock price.  All purchasers of TrueCar's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

160.  A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United*

*States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding TrueCar's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

161.   The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

162.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false and the statement was authorized and/or

approved by an executive officer and/or director of TrueCar who knew that such statement was false when made.

## XIV. CLASS ACTION ALLEGATIONS

163.  Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired (1) any of the publicly-traded securities of TrueCar from February 16, 2017 through November 6, 2017, inclusive, and who were damaged thereby, or (2) purchased or acquired the common stock of TrueCar pursuant or traceable to the secondary offering conducted on or about April 26, 2017 and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of TrueCar at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

164.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TrueCar shares were actively traded on the NASDAQ. As of November 3, 2017, there were over 99.99 million shares of TrueCar common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased TrueCar common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

165.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

166.   Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

167.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

      a.     whether the federal securities laws were violated by Defendants' acts, as alleged herein;

      b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

      c.     whether Defendants acted with scienter; and

      d.    the proper way to measure damages.

168.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XV.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT ONE

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against All Exchange Act Defendants)**

169.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

170.   This Count is asserted on behalf of all members of the Class against Defendants TrueCar, Guthrie, Perry and Pierantoni for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

171.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or disregarded with deliberate recklessness, misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

172.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of TrueCar common stock during the Class Period.

173.   Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of TrueCar shares, which were intended to, and did: (a) deceive the investing public, including Lead

Plaintiff and the other members of the Class, regarding, among other things, TrueCar's business and operations; (b) artificially inflate and maintain the market price of TrueCar shares; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

174.   Defendants TrueCar, Guthrie, Perry and Pierantoni are liable for all materially false and misleading statements made during the Class Period, as alleged above.

175.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of TrueCar common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

176.   Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for TrueCar common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the other members of the Class would not have purchased TrueCar common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

177.   Defendants' failure to disclose USAA's significant redesign of the co-branded car buying site, adversely and materially impacting TrueCar's traffic, units and revenues, also violated Regulation S-K Item 303(a)(3)(ii), requiring disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations."

178.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of TrueCar common stock during the Class Period.

## COUNT TWO

### For Violations Of Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

179.   Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

180.   This Count is asserted on behalf of all members of the Class against Defendants Guthrie, Pierantoni and Perry for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

181.   During their tenures as officers and/or directors of TrueCar, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶ 20-22. By reason of their positions of control and authority as officers and/or directors of TrueCar, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by TrueCar during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

182.   In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Guthrie, Perry and Pierantoni had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Guthrie, Perry and Pierantoni signed the Company's SEC

filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by TrueCar during the Class Period. Defendants Guthrie, Perry and Pierantoni were also directly involved in providing false information, and Defendants Guthrie and Perry certified and approved the false statements disseminated by TrueCar during the Class Period. As a result of the foregoing, Defendants Guthrie, Perry and Pierantoni, together and individually, were controlling persons of TrueCar within the meaning of Section 20(a) of the Exchange Act.

183.   As set forth above, TrueCar violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

184.   By virtue of their positions as controlling persons of Truecar, and as a result of their own aforementioned conduct, Defendants Guthrie, Perry and Pierantoni are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff, and the other members of the Class, who purchased or otherwise acquired TrueCar common stock. As detailed above in ¶¶ 20-151, during the respective times these Defendants served as officers and/or directors of TrueCar, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

185.   As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the Class suffered damages in connection with their purchase or acquisition of TrueCar common stock.

## XVI.      SECURITIES ACT CLAIMS

186.   In this part of the Complaint, and in Counts III through V below (the "Securities Act Claims"), Lead Plaintiff asserts strict liability and negligence claims under Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of the Class (as defined in ¶¶ 163-69), except that Lead Plaintiff explicitly disclaims subpart [c] of ¶

167 from these Securities Act allegations).  Lead Plaintiff expressly disclaims any allegations of knowing or reckless misconduct, and to avoid an (unfounded) argument by Defendants that the claims below somehow "sound in fraud," it is necessary to state or summarize facts also stated above.

## A.   Background for the Securities Act Claims

187.  The Securities Act Claims arise out of the public offering on April 26, 2017 of 10.35 million shares of TrueCar common stock at an offering price of $16.50 per share, generating approximately $170,775,000 million in gross proceeds (the "Offering").[6]  In the Offering, TrueCar sold 1,150,000 million shares of common stock, realizing a total of approximately $18,975,000 million in gross proceeds, and the selling shareholders sold 9,200,000 million shares of common stock for a total of approximately $151,800,000 million in gross proceeds.

188.   The Offering was conducted pursuant to a shelf registration statement filed with the SEC on Form S-3, dated January 19, 2017 and declared effective on February 6, 2017 (the "Registration Statement"); a Prospectus filed with the SEC, dated January 19, 2017 (the "Prospectus"); and a Prospectus Supplement filed with the SEC, dated April 26, 2017 (the "Prospectus Supplement" and, together with the Registration Statement and the Prospectus, the "Offering Documents").[7]

189.  As discussed in detail below, the Offering Documents, as well as the documents incorporated by reference therein, contain untrue statements of material fact or omit to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

---

[6] 1.35 million of the 10.35 million shares sold in the Offering were offered to the public as a result of the Underwriter Defendants' decision to exercise their overallotment option.

[7] The Offering Documents incorporate by reference the Company's (i) 2016 Form 10-K for the year ended December 31, 2016 filed with the SEC on March 1, 2017; (ii) portions of the Definitive Proxy Statement filed with the SEC on April 5, 2017; (iii) 8-Ks filed with the SEC on February 16, 2017 and March 10, 2017; and (iv) the description of the Company's common stock contained in the Registration Statement.

## B.   The Securities Act Parties

### 1.   Lead Plaintiff

190.  Lead Plaintiff Oklahoma Police purchased publicly-traded TrueCar common stock from Defendant Goldman, Sachs & Co. during the Class Period, including shares sold pursuant and/or traceable to the Offering at artificially inflated prices, and suffered damages as a result of the violations of the federal securities laws alleged herein.  Evidence of Oklahoma Police's transactions in the Company's common stock during the Class Period is set forth in Lead Plaintiff's certification. (*See* ECF No. 33-2.)

### 2.   Securities Act Defendants

191.  Each of the following Defendants is statutorily liable under Sections 11, 12(a)(2) and/or 15 of the Securities Act for the materially untrue statements or material omissions contained in and incorporated into the Offering Documents.

#### (i)   *TrueCar*

192.  Defendant TrueCar develops and publishes an online automobile information and communication platform. Defendant TrueCar was the issuer of the common stock offered pursuant to the Offering. TrueCar common stock trades on the NASDAQ under the symbol TRUE.

#### (ii)   *The Underwriter Defendants*

193.  Goldman, Sachs & Co. ("Goldman") was co-lead underwriter of the Offering.  Including its overallotment share, Goldman sold and distributed approximately 35% of the common stock offered (3,671,585 shares), worth approximately $60,581,160 million, earning a commission of approximately $2,877,605 million.

194.  J.P. Morgan Securities LLC ("JPM") was co-lead underwriter of the Offering.  Including its overallotment share, JPM sold and distributed approximately 30% of the common stock offered (3,147,073 shares), worth approximately $51,926,700 million, earning a commission of approximately $2,466,518 million.

195. RBC Capital Markets, LLC ("RBC") was an underwriter of the Offering. Including its overallotment share, RBC sold and distributed approximately 15% of the common stock offered (1,573,537 shares), worth approximately $25,963,360 million, earning a commission of approximately $1,233,260 million.

196. JMP Securities LLC ("JMP") was an underwriter of the Offering. Including its overallotment share, JMP sold and distributed approximately 10% of the common stock offered (1,049,024 shares), worth approximately $17,308,900 million, earning a commission of approximately $822,173.

197. B. Riley & Co., LLC ("B. Riley") was an underwriter of the Offering. Including its overallotment share, B. Riley sold and distributed approximately 4.4% of the common stock offered (454,390 shares), worth approximately $7,497,440 million, earning a commission of approximately $356,128.

198. Craig-Hallum Capital Group LLC ("CHCG") was an underwriter of the Offering.  Including its overallotment share, CHCG sold and distributed approximately 1.7% of the common stock offered (181,756 shares), worth approximately $ 2,998,980 million, earning a commission of approximately $142,452.

199. Stephens Inc. ("Stephens") was an underwriter of the Offering. Including its overallotment share, Stephens sold and distributed approximately 1.7% of the common stock offered (181,756 shares), worth approximately $2,998,980 million, earning a commission of approximately $142,452.

200. Loop Capital Markets LLC ("LCM") was an underwriter of the Offering.  Including its overallotment share, LCM sold and distributed approximately 00.88% of the common stock offered (90,878 shares), worth approximately $1,499,480 million, earning a commission of approximately $71,225.

201. Defendants Goldman, JPM, RBC, JMP, B. Riley, CHCG, Stephens and LCM are collectively referred to herein as the "Underwriter Defendants."

202.  The Underwriter Defendants acted as the underwriters of the April 2017 Offering by offering, selling and distributing the TrueCar common stock offered to the investing public and purchased by Lead Plaintiff and members of the Class.

203.  As a result, each of the Underwriter Defendants was obligated under the federal securities laws to conduct a reasonable investigation into the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.  Any reasonable investigation would have entailed a review of the current status of TrueCar's relationship with USAA, its most significant affinity group marketing partner driving 32% of the Company's revenue at the time of the Offering.  Such a review, in turn, would have revealed that the Offering Documents contained material misrepresentations, as alleged below.  None of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the Offering Documents.

(iii)   *The Officer Defendants*

204.  Defendant Chip Perry ("Perry") served as the Chief Executive Officer ("CEO") and President of TrueCar during the Class Period, and also served on the Company's Board of Directors. Perry has been CEO of the Company since December 2015.

205.  Defendant Michael Guthrie ("Guthrie") served as TrueCar's Chief Financial Officer from January 2012 through January 28, 2018, when he suddenly resigned for "personal reasons," and served as Interim Chief Operating Officer from September 2015 until December 2015.

206.  Defendant John Pierantoni ("Pierantoni") served as the Company's Chief Accounting Officer during the Class Period, a role he held since 2013.  As of February 1, 2018, Pierantoni serves as interim CFO of TrueCar.

207.  Defendants Perry, Guthrie and Pierantoni each were officers of TrueCar during the Class Period and each signed the Company's Registration Statement as

well as the Company's 2016 Form 10-K filed with the SEC on March 1, 2017, and the February 16, 2017 Form 8-K, which were incorporated into the Offering Documents.  These defendants are collectively referred to herein as the "Officer Defendants."

208.  By virtue of their positions as officers of TrueCar, and their status as signatories of the Registration Statement and 2016 Form 10-K, each of the Officer Defendants exercised significant influence over the operations of TrueCar and each had the power to control, and did control, TrueCar in its conduct of the April 2017 Offering.

209.  Based on their positions as officers of TrueCar and their status as signatories of the Registration Statement and 2016 Form 10-K, each of the Officer Defendants was obligated under the federal securities laws to conduct a reasonable investigation into the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.  Any reasonable investigation would have entailed a review of the current status of TrueCar's relationship with USAA, its most significant affinity group marketing partner driving 32% of the Company's revenue at the time of the Offering.  Such a review, in turn, would have revealed that the Offering Documents contained material misrepresentations, as alleged below.  None of the Officer Defendants made a reasonable investigation into the truthfulness and accuracy of the Offering Documents.

(iv)   *The Director Defendants*

210.  Defendant Chip Perry joined the TrueCar board of directors (the "Board") in December 2015 and remained on the Board through the end of the Class Period.

211.  Defendant Abhishek Agrawal ("Agrawal") became a member of the Board in November 2013 and remained on the Board through the end of the Class

Period, although he declined to stand for re-election at the 2017 Annual Stockholders meeting.

212.  Defendant Robert Buce ("Buce") became a member of the Board in April 2005 and remained on the Board through the end of the Class Period.  He also served as the Executive Vice President and Chief Financial Officer of TrueCar from September 2005 to September 2008.

213.  Defendant Christopher Claus ("Claus") became a member of the Board in April 2014 and Chairman of the Board in February 2016 and remained on the Board through the end of the Class Period.  From December 1994 to March 2014, Claus served in various senior executive roles at USAA, including Executive Vice President of USAA Enterprise Advice Group and President of USAA Financial Services Group.  Previously, he served as the Senior Vice President and then President of USAA Investment Management Company and Vice President of Investment Sales and Services.  From January 2009 through the present, Claus was and still is a member of the board of directors of USAA Real Estate Company.

214.  Defendant Steven Dietz ("Dietz") became a member of the Board in February 2006 and remained on the Board through the end of the Class Period.

215.  Defendant John Krafcik ("Krafcik") became a member of the Board in February 2014 and remained on the Board through the end of the Class Period. He also served as TrueCar's President from April 2014 until September 2015.

216.  Defendant Erin Lantz ("Lantz") became a member of the Board in November 2016 and remained on the Board through the end of the Class Period.

217.  Defendant Wesley Nichols ("Nichols") became a member of the Board in November 2016 and remained on the Board through the end of the Class Period.

218.  Defendant Ion Yardigaroglu ("Yardigaroglu") became a member of the Board in August 2007 and remained on the Board through the end of the Class Period.

219.  Defendants Perry, Agrawal, Buce, Claus, Dietz, Krafcik, Lantz, Nichols and Yardigaroglu are collectively referred to herein as the "Director Defendants" and, together with the Officer Defendants, the "Individual Defendants."

220.   Each of the Director Defendants was a member of the TrueCar Board during the Class Period, including at the time of the filing of the Offering Documents, and each signed the Registration Statement as well as the Company's 2016 Form 10-K filed with the SEC on March 1, 2017, which was incorporated into the Offering Documents.

221.  TrueCar's SEC filings state that its "business and affairs are managed under the direction of the Board[.]" Accordingly, by virtue of their positions as directors of TrueCar, and their status as signatories of the Registration Statement and 2016 Form 10-K, each of the Director Defendants exercised significant influence over the operations of TrueCar and each had the power to control, and did control, TrueCar in its conduct of the April 2017 Offering.

222. Based on their positions as directors of TrueCar and their status as signatories of the Registration Statement and 2016 Form 10-K, each of the Director Defendants was obligated under the federal securities laws to conduct a reasonable investigation into the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Documents.  Any reasonable investigation would have entailed a review of the current status of TrueCar's relationship with USAA, its most significant affinity group marketing partner driving 32% of the Company's revenue at the time of the Offering.  Such a review, in turn, would have revealed that the Offering Documents contained material misrepresentations, as alleged below.  None of the Director Defendants made a reasonable investigation into the truthfulness and accuracy of the Offering Documents.

223.  TrueCar, the Underwriter Defendants, the Officer Defendants and the Director Defendants are termed the "Securities Act Defendants."

## XVII. THE OFFERING DOCUMENTS CONTAINED MATERIAL MISREPRESENTATIONS

224.  In the Offering Documents, the Securities Act Defendants disclosed various risks related to TrueCar's April 2017 Offering.  Certain of those disclosures discuss the financial significance of the Company's relationships with its affinity group marketing partners for which TrueCar maintains car-buying websites.

225.  The Offering Documents stated that any adverse change in the Company's relationship with TrueCar that may occur "in the future" would cause TrueCar's financial results to decline.  For instance, the Offering Documents stated:

> In addition, USAA has broad discretion in how the car-buying site we maintain for USAA is promoted and marketed on its own website. Changes in this promotion and marketing have in the past and may in the future adversely affect the volume of user traffic we receive from USAA.  Changes in our relationship with USAA or its promotion and marketing of our platform could adversely affect our business and operating results in the future.

226.  Additionally, the Offering Documents also specifically represented that, if USAA were to use its broad discretion to change the car buying website in a way that "de-emphasized" TrueCar's car buying platform in any way, TrueCar's business and revenues would be significantly harmed:

> Any adverse change in our relationship with United Services Automobile Association, or USAA, could harm our business.
>
> [. . .]  At any given time, USAA's car-buying service may or may not be a priority relative to its other offerings.  Consequently, changes in how USAA promotes and markets the car-buying we maintain for them can and has, from time to time in the past, affected the volume of purchases generated by USAA members.  For example, in the past USAA adjusted the location and prominence of the links to our platform on its web pages, adversely affecting the volume of traffic to our platform.  Should USAA or one or more of our other affinity group marketing partners decide to de-emphasize the marketing of our platform, or if their marketing efforts are otherwise unsuccessful, our revenue, business and financial results will be harmed.

227.   These statements were materially false and misleading and omitted material information.  The statements warning of the risk that USAA "may" change the co-branded car buying website "in the future," thereby significantly harming TrueCar's business and revenues, represented that <u>no such change had yet occurred</u>.  However, by January 2017—months before the April 2017 Offering—USAA had already significantly redesigned the car buying website to require USAA members to answer numerous additional questions pertaining to their personal finances before they could access the TrueCar car buying site.  Pursuant to the Company's own statements in the Offering Documents, this "de-emphasis" of TrueCar's car buying platform would and did significantly harm TrueCar's revenue, business and financial results.

228.   In addition to incorporating by reference TrueCar's 2016 Form 10-K, which includes the same materially false statements alleged above, the Offering Documents incorporated by reference TrueCar's February 16, 2017 Form 8-K, which included the Company's February 16, 2017 fourth quarter and full year 2016 earnings press release.

229.   The Company's February 16, 2017 earnings release represented that TrueCar was "re-accelerating [its] top-line growth while also improving [] margins," and would "<u>continue to drive double-digit rates of unit and revenue growth for some time</u>."   Additionally, the earnings release represented that the Securities Act Defendants had "<u>set the stage for strong growth and margin expansion over the next few years</u>."

230.   These statements were materially false and misleading and omitted material information.  Specifically, "double-digit rates of unit and revenue growth" were not going to continue as USAA had already decided to significantly change its co-branded website with TrueCar with a "significant website redesign" that would adversely affect the Company's financial results.  Changes to USAA's website

would negatively and materially impact TrueCar's business and revenue as "in the past USAA adjusted the location and prominence of the links to [TrueCar's] platform on its web pages, adversely affecting the volume of traffic to [the Company's] platform." In fact, USAA's 2017 changes were far more significant than merely changing the location of links to the TrueCar platform. Accordingly, the above statements about TrueCar's business, operations, and prospects, were materially false and misleading.

## XVIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT III

#### For Violations of Section 11 of the Securities Act
#### (Against TrueCar, the Individual Defendants and the Underwriter Defendants)

231.   Lead Plaintiff repeats and realleges each and every allegation above relating to the Securities Act Claims as if fully set forth herein. The Securities Act Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the Offering pursuant to the Offering Documents and the documents incorporated by reference therein, which contained untrue statements of material fact, or omitted material facts. This Count is based solely in strict liability and negligence. This Claim for Relief does not sound in fraud and any allegations of knowing or reckless misrepresentations in the Offering Documents or the documents incorporated by reference therein are excluded from this Count. For purposes of asserting this and its other claims under the Securities Act, Lead Plaintiff does not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent.

232.   This Count is brought by Lead Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against the Securities Act Defendants named in this Count on behalf of itself and members of the Class who purchased or otherwise

acquired the securities sold pursuant and/or traceable to the Offering and were damaged by the acts alleged herein.

233.   Defendant TrueCar was the issuer, within the meaning of Section 11 of the Securities Act and pursuant to the Offering Documents, of the registered securities sold in the Offering.

234.   As discussed above, TrueCar issued and TrueCar and the Selling Shareholders sold to the Underwriter Defendants 10.35 million shares of common stock in the Offering.   The Individual Defendants each signed the Registration Statement—included in the Offering Documents—as a senior officer and/or director of TrueCar within the meaning of Section 11 of the Securities Act.  The Underwriter Defendants acted as the underwriters of the Offering within the meaning of Section 11 of the Securities Act by selling and distributing the TrueCar common stock offered to the investing public and purchased by Lead Plaintiff and members of the Class.

235.   The common stock described in this Count was issued and sold pursuant to the Offering Documents, which include the Registration Statement.  All purchases of the registered securities after the issuance of the Offering Documents are traceable to the Offering Documents.

236.   As alleged above, the Offering Documents contained untrue statements of material fact concerning, among other things, the current status of TrueCar's relationship with USAA at the time of the Offering.

237.   The Securities Act Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Offering Documents, as set forth above.

238.   The Securities Act Defendants' failure to disclose USAA's significant redesign of the co-branded car buying site, adversely and materially impacting

TrueCar's traffic, units and revenues, also violated Regulation S-K Item 303(a)(3)(ii), requiring disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations."

239.   In connection with offering the registered securities to the public and the sale of those securities, the Securities Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

240.   As the issuer of the registered securities, TrueCar is strictly liable for the untrue statements of material fact described herein.

241.   None of the other Securities Act Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements alleged herein.

242.   Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents, including the Registration Statement, contained untrue statements of material fact when they purchased or acquired registered securities pursuant and/or traceable to the Offering.

243.   As a direct and proximate result of the acts and omissions of the Securities Act Defendants in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of TrueCar common stock sold through the Offering.

244.   By reason of the foregoing, the Securities Act are liable under Section 11 of the Securities Act to the members of the Class who purchased or otherwise acquired the securities sold pursuant and/or traceable to the Offering Documents.

245.   This claim is brought within one year of the discovery of the untrue statements in the Offering Documents, and within three years after the issuance of the Offering Documents.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act
### (Against TrueCar and the Underwriter Defendants)

246.   Lead Plaintiff repeats and realleges each and every allegation above relating to the Securities Act Claims as if fully set forth herein.  Defendant TrueCar and the Underwriter Defendants' liability under this Count is predicated on the participation of each defendant named in this Count in conducting the Offering pursuant to the Offering Documents and the documents incorporated by reference therein, which contained untrue statements of material fact.  This Count is based solely in strict liability and negligence.  This Claim for Relief does not sound in fraud and any allegations of knowing or reckless misrepresentations in the Offering Documents or the documents incorporated by reference therein are excluded from this Count.  For purposes of asserting this and its other claims under the Securities Act, Lead Plaintiff does not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent.

247.   This Count is brought by Lead Plaintiff pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, against TrueCar and the Underwriter Defendants on behalf of itself and members of the Class who purchased or otherwise acquired shares of TrueCar common stock pursuant to the Offering Documents, which include the Prospectus and Supplemental Prospectus, and were damaged by the acts alleged herein.

248.   TrueCar and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchases of the shares offered pursuant to the Offering Documents within the meaning of Section 12(a)(2) of the Securities Act.

249.   As alleged above, the Offering Documents contained untrue statements of material fact concerning, among other things, the current status of TrueCar's relationship with USAA at the time of the Offering.

250.   By means of the Offering Documents and by using the means and instruments of transportation and communication in interstate commerce and of the mails, the Securities Act Defendants named in this Count, through public offerings, solicited and sold TrueCar common stock to members of the Class.

251.   As the issuer of the registered securities, TrueCar is strictly liable for the untrue statements of material fact described herein.

252.   None of the Underwriter Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements alleged herein.

253.   Members of the Class purchased TrueCar common stock pursuant to the materially untrue Offering Documents.  At the time they purchased shares in the Offering, no member of the Class knew, or by the reasonable exercise of care could have known, of the material misstatements in the Offering Documents, which include the Prospectus and Supplemental Prospectus.

254.   As a direct and proximate result of the acts and omissions of the Defendants TrueCar and the Underwriter Defendants named in this Count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase of TrueCar common stock sold pursuant to the Offering Documents.

255.   By reason of the foregoing, the Securities Act Defendants named in this Count are liable under Section 12(a)(2) of the Securities Act to the members of the

Class who purchased or otherwise acquired TrueCar common stock sold pursuant to the Offering Documents.

256.   Accordingly, members of the Class who purchased TrueCar common stock pursuant to the Offering Documents have the right to rescind and recover the consideration paid for such securities from the Underwriter Defendants upon tender of their stock to TrueCar and hereby elect to rescind and tender such securities. Members of the Class who have sold their TrueCar common stock issued in the Offering are entitled to rescissory damages.

257.   This claim is brought within one year of the discovery of the untrue statements in the Offering Documents, and within three years after the Offering.

## COUNT V

### For Violations of Section 15 of the Securities Act
### (Against the Individual Defendants)

258.   Lead Plaintiff repeats and realleges each and every allegation above relating to the Securities Act Claims as if fully set forth herein.  This Claim for Relief does not sound in fraud and any allegations of knowing or reckless misrepresentations in the Offering Documents or the documents incorporated by reference therein are excluded from this Count.  For purposes of asserting this and its other claims under the Securities Act, Lead Plaintiff does not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent.

259.   This Count is brought by Lead Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants on behalf of itself and members of the Class who purchased or otherwise acquired shares of TrueCar common stock pursuant and/or traceable to the Offering Documents and were damaged by the acts alleged herein.  For purposes of this Count, Lead Plaintiff

asserts only strict liability and negligence claims and expressly disclaims any allegation of fraud or intentional misconduct.

260.   As set forth in Counts III and IV above, TrueCar is strictly liable under Sections 11 and 12(a)(2) of the Securities Act for untrue statements of material fact in the Offering Documents.

261.   At all relevant times, the Individual Defendants were controlling persons of TrueCar within the meaning of Section 15 of the Securities Act.  As set forth herein, by virtue of their positions, voting power, ownership, rights as against TrueCar, and/or specific acts, the Individual Defendants had the requisite power to directly or indirectly control or influence TrueCar to engage in the acts described herein, including by causing TrueCar to conduct the Offering pursuant to the Offering Documents and documents incorporated by reference therein, and exercised the same.

262.   Specifically, the Officer Defendants each served as an executive officer of TrueCar at the time of the Offering.  As such, at all relevant times the Officer Defendants each participated in the operation and management of TrueCar, including participating in the preparation and dissemination of the Offering Documents, and the documents incorporated by reference therein, and/or otherwise participated in the process necessary to conduct the Offering.  By virtue of their positions as officers of TrueCar, and their status as signatories of the Registration Statement and 2016 Form 10-K, each of the Officer Defendants had the power to control, and did control, TrueCar in its conduct of the Offering, including controlling the contents of the Offering Documents and documents incorporated by reference therein, which contained materially false statements.

263.   Similarly, each of the Director Defendants served as directors on TrueCar's Board at the time the Offering was conducted and/or at the time the Registration Statement and 2016 Form 10-K were signed.  As directors of a publicly

owned company, the Director Defendants had a duty to disseminate accurate and truthful information with respect to the status of TrueCar's relationship with USAA at the time of the Offering.  Each Director Defendant signed the Registration Statement and the 2016 Form 10-K incorporated by reference therein and/or were directors at the time the Offering was conducted, the Offering Documents were disseminated o the investing public and the Registration Statement became effective. Thus, the Director Defendants controlled the contents and dissemination of the Offering Documents.

264.  By reason of the aforementioned conduct and by virtue of their positions as controlling persons of TrueCar, each of the Individual Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as TrueCar is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired TrueCar common stock pursuant and/or traceable to the Offering Documents.  As a direct and proximate result of the conduct of these Securities Act Defendants, members of the Class suffered damages in connection with their purchase or acquisition of these securities.

## XIX. <u>PRAYER FOR RELIEF</u>

265.  Wherefore, Lead Plaintiff prays for relief and judgment as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding Lead Plaintiff and the class members damages, including interest;

c.    Awarding Lead Plaintiff reasonable costs, including attorneys' fees and expenses; and

d.    Awarding such equitable/injunctive or other relief for the benefit of the Class as the court may deem just and proper.

## XX.   <u>JURY DEMAND</u>

266.   Lead Plaintiff demands a trial by jury.

Dated: August 24, 2018

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By:  */s/    Justin B. Farar*

Justin B. Farar (SBN 211556)
12400 Wilshire Boulevard, Suite 820
Los Angeles, CA 90025
Telephone: 310.575.8604
Facsimile: 310.444.1913
Email: jfarar@kaplanfox.com

-and-

Laurence D. King (SBN 206423)
Mario M. Choi (SBN 243409)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415.772.4700
Facsimile: 415.772.4707
Email: lking@kaplanfox.com
         mchoi@kaplanfox.com

Robert N. Kaplan (admitted *pro hac vice*)
Jeffrey P. Campisi (admitted *pro hac vice*)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
         jcampisi@kaplanfox.com

*Liaison Counsel for Lead Plaintiff and the Class*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker (241590)
Dianne M. Anderson (286199)
150 E. Palmetto Park Road, Suite 600
Boca Raton, FL 33432
Telephone:  (561) 394-3399
Facsimile:   (561) 394-3382

E-mail:     msaxena@saxenawhite.com
              jwhite@saxenawhite.com
              lhooker@saxenawhite.com

danderson@saxenawhite.com

-and-

Steven B. Singer
Kyla Grant
Sara DiLeo
10 Bank Street, 8th Floor
White Plains, NY 10606
Telephone:  (914) 437-8551
Facsimile:   (888) 631-3611
E-mail:       ssinger@saxenawhite.com
                   kgrant@saxenawhite.com
                   sdileo@saxenawhite.com

*Lead Counsel for Lead Plaintiff Oklahoma
Police Pension and Retirement Fund and the
Class*

1

2

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

3

4

5

6

7

I HEREBY CERTIFY that, on August 24, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

8

Executed on August 24, 2018.

9

*/s/ Justin B. Farar*

10

Justin B. Farar

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28